

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-14-2006

# USA v. Price

Precedential or Non-Precedential: Precedential

Docket No. 05-2968

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Price" (2006). *2006 Decisions.* Paper 526.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/526

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-2968

———

UNITED STATES OF AMERICA

v.

KEENAN PRICE,

Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 03-cr-00147)
District Judge:  Honorable William H. Yohn, Jr.

———

Argued June 15, 2006
Before:  FISHER, CHAGARES and
REAVLEY,[*] *Circuit Judges*.

(Filed: June 30, 2006)

_____

[*]The Honorable Thomas M. Reavley, United States
Circuit Judge for the Fifth Circuit, sitting by designation.

Paul J. Hetznecker (Argued)
1420 Walnut Street, Suite 911
Philadelphia, PA 19102
        *Attorney for Appellant*

Joseph F. Minni (Argued)
Office of United States Attorney
615 Walnut Street, Suite 1250
Philadelphia, PA 19106
        *Attorney for Appellee*

―――――

OPINION OF THE COURT

―――――

FISHER, *Circuit Judge*.

Keenan Price appeals from convictions on drug and gun possession charges.[1] Price raises three issues: first, that the District Court improperly allowed two police officers to present hearsay testimony about the contents of the radio report to which they responded; second, that the District Court

―――――――――――

[1]The statutes of conviction are 21 U.S.C. §§ 841(a)(1), (b)(1)(A) (crack); 21 U.S.C. §§ 841 (a)(1), (b)(1)(C) (cocaine); 18 U.S.C. § 922(c) (gun possession in furtherance); 18 U.S.C. § 922 (g) (gun possession by convicted felon). This appeal began as a postconviction petition under 28 U.S.C § 2255, but the District Court resentenced Price nunc pro tunc to allow him to convert his petition to a direct appeal.

2

improperly allowed the government's expert witness to testify about Price's mental state; and third, that the District Court improperly instructed the jury on the meaning of "in furtherance" in 18 U.S.C. § 922(c). We can discern no impropriety in the District Court's rulings, and will affirm on all three issues.

## I.

Price was arrested along with two other men while sitting in a parked car in a parking lot in Philadelphia. Drugs and drug paraphernalia were found in the car, and when the car was subsequently searched, pursuant to a warrant, drugs and a gun were found in the trunk. Philadelphia police officer Frank Bonett, who had been observing the parking lot while performing drug surveillance, testified that he had seen Price open the trunk, take a gun out of his pants, and place it in the trunk.

There were several officers in the vicinity of the parking lot that night. Relevant to this case were Bonett, the surveillance officer, who was hiding in and around other cars in the lot, and two backup officers, Sergeant Anthony Chiarolanza and Officer Thomas Lacorte, who were waiting nearby in an unmarked car. Chiarolanza and Lacorte were part of the "backup" team, whose job was to move in when called, and support any eventual arrest. Midway through the surveillance operation one of the alleged drug dealers apparently spotted Chiarolanza and Lacorte and identified them as police. The alleged dealer then alerted Price to the presence of police. At that point, according to Bonett's testimony, Price got into the car

and moved it to another area of the parking lot, then reached into his pants, took out a gun, opened the trunk, put the gun inside, and sat down again in the driver's seat.

When Bonett saw that Price had a gun, he reported this fact on the radio, at which point Chiarolanza and Lacorte moved in and approached the car, following what they testified was the standard police protocol, in surveillance operations, of arresting a suspect immediately once a gun is observed, rather than continuing to perform surveillance. Price and the other two men were removed from the car and searched. They had nothing incriminating on their persons, but vials of crack were found in the car, clearly prepared for sale, including some in a bag under the driver's seat, where Price had been sitting, and under which he had been observed reaching by Chiarolanza and Lacorte as they approached the car.

At trial, Bonett testified as to what he'd seen while performing surveillance. He stated that he observed Price engage in several transactions with individuals who approached the car, and that after being warned of the police presence, Price had removed the gun from his pants and placed it in the trunk.

Chiarolanza testifed after Bonett. The government elicited from Chiarolanza a hearsay account of those latter details as Bonett had reported them on the radio: that Price had taken a gun from his pants and placed it in the trunk of the car. The defense objected on hearsay grounds, and the District Court allowed the testimony as "background" to explain the context of Chiarolanza's actions, instructing the jury that the testimony about the radio call was to be used solely to explain why

4

Chiarolanza had approached the car, and not for the truth of its content, viz., that Price in fact had possession of the gun. Officer Lacorte testified after Chiarolanza, and the government elicited from him similar testimony. Between them, the two officers used the term "gun" nine times.

Price appeals, charging that the government used the hearsay testimony of the other two officers to bolster Bonett's testimony. Price's defense was that none of the contraband found in the trunk was his, and his trial strategy was to attack the credibility of Bonett's testimony, and to emphasize the lack of corroborating eyewitnesses or physical evidence to confirm that Price had been in possession of the gun. He argues that by allowing Chiarolanza and Lacorte to relate the contents of the radio call to which they responded, the District Court contravened our teaching in *United States v. Sallins*, 993 F.2d 344 (3d Cir. 1993), about how the rule against hearsay should be applied in such situations.

The government also called an expert witness to testify about the common behaviors of drug sellers as opposed to drug buyers. Drug buyers, the witness testified, almost never bring a gun to the transaction. Drug sellers, on the other hand, almost always have a gun at hand or readily available. Price contends that this testimony constituted impermissible speculation as to his mental state.

Finally, the District Court instructed the jury on the meaning of "in furtherance" in § 922(c). Price challenges the adequacy of that instruction.

We consider Price's contentions in turn.

## II.

### A. Hearsay

### 1. Standard of Review

At the threshold, we ask, first, whether we are reviewing a legal determination or a discretionary application of the rules of evidence. We ask, second, whether Price has sufficiently preserved this issue for review.

Whether a statement is hearsay is a legal question subject to plenary review. *Sallins*, 993 F.2d at 334. If the district court correctly classifies a statement as hearsay, its application of the relevant hearsay exceptions is subject to review for abuse of discretion. *United States v. Tyler*, 281 F.3d 84, 98 (3d Cir. 2002).

If the government had sought to introduce the statements under one of the hearsay exceptions of Rule 803, then our review would be for abuse of discretion. But the government's grounds for introduction were not that the testimony fit one of the exceptions, but rather that the testimony was not hearsay, because it was offered not for its truth but rather as background to explain the context of the responding officers' actions. Because the government did not invoke, and the District Court did not apply, one of the established hearsay exceptions, the issue for us is whether the statements were hearsay. Price argues that the statements were hearsay, insofar as they actually served as substantive corroboration of Bonett's eyewitness

6

testimony. If they served the substantive purpose of corroborating Bonett's testimony, they were hearsay; if they served only to provide background information, they were not hearsay. Whether the challenged statements are hearsay is a legal question, and our review is plenary.

The second threshold question is whether Price preserved this objection for our review. At trial, defense counsel objected only once on hearsay grounds, during Chiarolanza's testimony. The District Court ruled, on that objection, that Chiarolanza's account of Bonett's radio report could come in as background, to explain Chiarolanza's presence on the scene. That portion of the transcript is excerpted below. The hearsay objection was raised after Chiarolanza had made four references to Price's having had a gun, and the prosecution had made one such reference. Following the District Court's cautionary instruction, Chiarolanza referred to the gun twice more. Lacorte, in his testimony, referred to the gun three times. The government contends that because Lacorte's references to the gun came after the District Court's instruction, we should review those references (and presumably, on the same logic the latter two of Chiarolanza's references) for plain error.

We do not agree; our plain error jurisprudence is not so parsimonious. We apply plain error review when an issue was not brought to the attention of the district court. *See*, *e.g.*, *Collins v. Alco Parking*, 448 F.3d 652 (3d Cir. 2006) (Becker, J.). That certainly was not the case here. The ground of the defense's objection was clear: police officers other than Bonett should not be permitted to relate what they heard Bonett say on the radio. The government argued that such testimony was

7

admissible for the purpose of explaining the officers' actions. The District Court agreed. No reasonable attorney would doubt that the ruling covered Lacorte as well as Chiarolanza. Lacorte testified immediately after Chiarolanza, and their testimony was materially identical: each said that the two of them heard Bonett report that Price had a gun, and thereupon approached the car and arrested Price. The purpose of requiring contemporaneous objection at trial for full appellate review is to ensure that the trial court has an opportunity to consider and rule on disputed questions of law. When an issue has been raised, and a ruling made, that purpose is served. We do not suggest, to be sure, that a single objection to one statement by one witness, preserves an issue as to all statements by all witnesses. But we think it clear enough on this record that counsel raised the issue and preserved it for appeal. We therefore proceed to the merits of Price's claim.

## 2. Merits

Chiarolanza testifed as follows:

> Q: At that time, what did you decide to do?

> A: Officer Bonnett was relaying information via our hand-held radios and he stated that he observed the defendant exit the white Pontiac, go to the rear of the Pontiac, and **remove a handgun from his waistband area**.

Q: And this was once the defendant was already Parking Lot 2?

A: That's correct.

Q: And what did he observe; **he removed the gun from his waistband area** and did what with it, sir?

A: And placed it in the –

[Defense Counsel] Your Honor, I'm objecting at this time as it's clearly hearsay.

[The Court] It's what?

[Defense Counsel] It's hearsay.

[The Court] Yes, all right. Is there an exception you want to apply to this?

[Gov.] I'm trying to get to the actions this gentleman took as a result of the information he received.

[The Court] All right, you may do so.

Q: As a result of the information you received –

9

A: As a result of that information, I determined to terminate the investigation due to the officer and public safety. Any time **there's a handgun involved**, my attention is solely focused on the confiscation and **recovery of the handgun**. At that time, I instructed the other takedown officers to come in, so that we can effectively make the arrest of the defendant and **make the recovery of the handgun**.

At this point, the District Court gave the following instruction:

Members of the jury, the testimony about what Officer Bonnett said to him . . . is not admissible to prove the truth of what Officer Bonnett saw . . . [I]t is offered here solely to explain why this sergeant did what he did, so you use it only to – for the purpose of explaining why this sergeant did what he did after hearing that information, not for the truth of what happened.

The government then continued:

Q: So you made the call at that point to do what, sir?

A: To terminate the investigation and, again, go to Parking Lot number 2, which is where Officer Bonnett stated the vehicle was parked and the defendant was, to, again,

effectively **make the arrest and confiscate the handgun**.

> . . .

> Q: What did you do when you saw [Price's] movement, sir?

> A: As I observed this, I was relaying that to Officer Lacorte to be careful, again because of **the fact that there was a handgun involved**.

The relevant portion of Officer Lacorte's testimony is as follows:

> Q: How was it that you came into contact with the defendant, Keenan Price, that evening?

> A: On that evening we were doing a narcotics surveillance of the 200 block of East Ashmead Street. Through information I received from Police Officer Bonett, he was our surveillance officer, to go in and stop the defendant, that **the defendant took a handgun out of his waistband** and placed it in the trunk of a white Pontiac Sunbird.

> . . .

> Q: Whose call was it to effectuate the arrest?

11

A: Sergeant Chiarolanza. **Once we see there's a gun out there**, Police Officer Bonett said to come in and Sergeant Chiarolanza told the other backup team members to come in, because we stopped the narcotics surveillance at that time and we just go in to **get the individual with the gun**.

Price argues that because Bonett's radio report was admitted for the specific purpose of establishing background context for the actions of Chiarolanza and Lacorte, its contents should not have been admissible. Price does not dispute that the District Court's instruction clearly explained that Chiarolanza's and Lacorte's recitations of the contents of Bonnett's report were not to be considered for their truth; rather, he contends that under *Sallins*, no details about the contents of the call should have been admitted even for the non-hearsay purpose of establishing background context for the police response.

*Sallins* is our fullest articulation of the application of the rule against hearsay to statements by police officers about the content of radio reports from other officers, and we recognized there that "the use of out-of-court statements to show background has been identified as an area of 'widespread abuse.'" 993 F.2d at 346.

In *Sallins*, a gun possession case, an officer testified that he and his partner responded to a radio dispatch stating that a 911 call had just reported that a black man in black clothes was on a particular block carrying a gun. The officer testified that he responded to the report by approaching the block, and there

12

observed a black man in black clothes, Sallins, walking along the sidewalk. Upon seeing the police car, Sallins appeared to throw something under a car and then ran away. One officer gave chase and arrested Sallins, while the other looked under the cars near where Sallins had been walking, and discovered a gun. No physical evidence connected Sallins to the gun. "[T]he only admissible evidence linking Sallins to the possession of a gun was circumstantial evidence conveyed through the testimony of Officers Santiago and Howard. Sallins vigorously challenged the credibility of this testimony." *Sallins*, 993 F.2d at 344.

Sallins went to trial and successfully excluded evidence of the radio call as inadmissible hearsay. That trial ended in a mistrial. On retrial, the government persuaded the district court to allow the responding officers to describe the contents of the radio dispatch about the 911 call, as "background" explanation of their actions. The evidence described above was introduced, and Sallins was convicted.

When the case reached us, we held that because the testimony about the contents of the radio report was admitted only for "background" – to explain why the officers responded to the scene – and not as substantive evidence that Sallins had possessed the gun, the incriminating details about the contents of the radio report should not have been admitted. Our duty, we stated, is to carefully scrutinize the actual evidentiary function that ostensibly "background" evidence played at trial, to see whether it really served any legitimate non-hearsay function. If the legitimate non-hearsay probative value of particular testimony is nil or de minimis, and the substantive (hearsay) value is great, then it should be excluded. Such scrutiny is

13

necessary "if the hearsay rule is to have any force" in the context of police radio reports. *Id.* at 347.

The non-hearsay evidentiary function of testimony about a police radio call is to provide a "background" explanation for the testifying officer's actions – that is, to explain what the officer was doing at the scene. The jury need not, we explained in *Sallins*, be led to believe that officers responding to a report of criminal activity just "happened by." Neither, however, may the other officers relate the contents of that report if the same contextual explanation could be adequately conveyed by the statement that the officer was responding to "information received."

> In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient.

*Sallins*, 993 F.2d at 346.

The government distinguishes *Sallins* by pointing out that the disputed radio report in *Sallins* originated from an anonymous 911 call, and no eyewitness testified as to Sallins' possession of the gun. By contrast, the report at issue in the instant case came from an eyewitness, Bonett, who testified at trial. Thus, unlike in *Sallins*, the credibility of the eyewitness account was directly tested.

14

*United States v. Lopez*, 340 F.3d 169 (3d Cir. 2003), is the only published case in which we have applied *Sallins*, and it too involves an anonymous tip.  In *Lopez*, the defendant, a prisoner, was charged with heroin possession after heroin was found concealed in his cell.  No physical evidence or eyewitness testimony connected Lopez to the drugs, and his defense was that because the cells were open during the day, the drugs could have been hidden in his cell by any of the more than one hundred inmates on the cell block who had access to the cell. To rebut this defense, two prison guards testified that they searched Lopez's cell because they had "received information that Lopez was in possession of heroin," *id.* at 175, either on his person or in his cell.  Lopez objected on hearsay grounds, and the district court ruled that the testimony was admissible as background explanation for the officers' conduct.

We disagreed.  We applied the *Sallins* analysis and noted, first, that the government could easily have established the background for the search by presenting evidence that the officers "acted upon information received."  Second, we noted that Lopez' defense centered on the lack of evidence that the drugs were his, and the significant possibility that they were someone else's given the widespread access to the cell.  The lack of direct evidence connecting Lopez to the drugs, we said, rendered suspect the government's contention that the hearsay evidence was not introduced in order to establish that connection.  And that contention was further undermined by the fact that the government highlighted the hearsay statements in its closing argument. The government's "emphatic invocation," of the substantive details of the hearsay report, *id.* at 177, strengthened the likelihood that the jury would think that "the

15

officers' 'information that Albert Lopez was in possession of heroin' was itself a datum in the construction of the government's substantive case." *Id.*

We reversed, emphasizing that, having found error in the admission of the hearsay testimony, "[t]he dispositive question . . . is not whether, in the absence of the inadmissible hearsay evidence, the jury nevertheless could have convicted Lopez. Rather, the question is whether the improperly admitted statements may have helped to cement[] the government's case." *Id.* (internal quotes omitted).

While neither *Sallins* nor *Lopez* rests explicitly on the anonymous nature of the initial source of the information contained in the challenged report, we think that our underlying concern in those cases was that the government was seeking to indirectly present testimony from an unseen eyewitness who did not himself appear.[2]

_____

[2]The instant case does not present any Confrontation Clause issues because the challenged hearsay statements were made by Bonett, who testified at trial and was available for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 60 n.9 (2004) ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."). And it is not at all certain that Bonett's statements would be considered "testimonial" under *Davis v. Washington*, 547 U.S. --- (2006), decided this Term. Insofar as Bonett was contemporaneously reporting that a suspect had a gun, his statement could well be considered "dealing with an

The evidentiary danger posed by police officers' testimony about the contents of reports received in connection with the performance of their duties is greatest when the government does not put on direct evidence of the substance of the reports. That danger is least, by contrast, when the direct source of the report personally testifies as to the precise facts related in the report. The teaching of *Sallins* and *Lopez* is that courts must not allow the government, in the guise of "background explanation" testimony by police officers, to put before the jury eyewitness accounts of bad acts by the defendant that the jury would not otherwise have heard. When evidence admitted as "background" includes such facts, we will exclude or redact it to the extent that its actual evidentiary function is not the (legitimate) one for which it was admitted. *Sallins* held that we must scrutinize asserted background evidence to see whether redaction or exclusion would be possible while preserving the legitimate background evidentiary function. But *Sallins* did not hold that it could never be the case that a background explanation might, in order to serve its legitimate background evidentiary function, require inclusion of prejudicial details insofar as they constituted an integral part of the explanation for the officer's actions. *Sallins*, in sum, identifies a particular type of hearsay error – admission of the contents of police reports beyond the extent necessary for background explanation – and provides a method – inquiry into whether a particular piece of testimony is necessary for that background explanation – for determining whether that error occurred.

---

emergency" rather than "investigating criminal conduct," and under *Davis*, only the latter is "testimonial" for Confrontation Clause purposes.

The legitimate non-hearsay evidentiary purpose asserted for the challenged testimony in this case is to explain why Chiarolanza and Lacorte approached the car. The *Sallins* rule is that if an officer can answer that question by saying he acted "upon information received," any further revelation of the contents of the information received is impermissible hearsay. The *Sallins* test thus contemplates an inquiry into the nature of the proffered background explanation. Price argues that Chiarolanza and Lacorte could adequately have explained their actions by stating simply, "Bonett called for backup," or "We received information on the radio to which we responded." Price argues, in other words, that divulging that Bonett's radio report asserted that Price had a gun is not necessary to establish the legitimate evidentiary purpose asserted by the government.

We disagree. The government correctly points out that, unlike the responding officers in *Sallins*, Chiarolanza and Lacorte were not on a routine patrol when they received the radio report; they were in the middle of a drug surveillance operation. And by approaching the car, they terminated that surveillance operation without having amassed any concrete evidence of drug transactions: no alleged buyers, for example, had been identified or apprehended, an investigatory failure of which defense counsel made much in his closing argument. The government contends that in such circumstances, an adequate explanation for why the officers terminated the surveillance operation requires disclosure of the report of a gun, because, as the testimony in this case explained, unlike officers on routine patrol, officers on surveillance operations do not generally terminate the operations in response to radio dispatches. Instead, they terminate the operations only when necessary to

18

respond to an imminent threat of violence, such as a report of a suspect with a gun.

We agree that this is a distinction with a difference. Police officers are permitted under *Sallins* to explain the background context for their arrival at a scene. When the explanation cannot be effected without relating some contents of the information received, *Sallins* does not prohibit admission of such details.

We think this case presents a scenario in which disclosure that the responding officers received a report that the suspect had a gun was necessary for an adequate explanation of the officers' arrival at the scene. The *Sallins* rule requires case-by-case inquiry into the factual context of the police response, and on these facts, we do not read *Sallins* as prohibiting the government from introducing an explanation of why the officers terminated the surveillance operation early.

Furthermore, the District Court's instruction made it clear to the jury that the only witness testifying on the factual question of whether Price in fact had possession of the gun was Bonett. No reasonable juror could have been confused about the instruction: the testimony given by Chiarolanza and Lacorte about the contents of the radio report was not to be considered for the purpose of determining whether that report was true. An analogous instruction did not cure the error in *Sallins* or *Lopez* because the disputed factual information would not otherwise have reached the jury at all. But that is not the case here. The jury had already heard Bonett's testimony, and we have no reason to doubt, on this record, that the jurors clearly understood

19

that the case turned on whether they believed Bonett. We do not think that Chiarolanza's and Lacorte's testimony muddied the deliberative waters.

We emphasize that the legal issue in this case is whether the challenged testimony was hearsay. The fact that an out-of-court declarant also testified at trial does not have any bearing on the question of whether another witness's report of what the out-of-court declarant told him is or is not hearsay. Price is absolutely right that there is no general "But he testified!" exception to the rule against hearsay. That proposition does not help Price, however. As we have explained, Chiarolanza's and Lacorte's testimony was not hearsay, because it was not offered for its truth.

The fact that Bonett testified at trial is relevant not to the question of whether Chiarolanza's and Lacorte's background testimony would have been hearsay if offered for its truth – it would – but rather to the question of whether that background testimony was really background. To apply *Sallins*, we must ask what the actual evidentiary effect of Chiarolanza's and Lacorte's testimony was: did it provide legitimate background context, or did it in fact serve as illegitimate backdoor eyewitness testimony? If Bonett had not testified, we would have little difficulty in concluding that Chiarolanza's and Lacorte's testimony was serving the latter, illegitimate, evidentiary function. But given that Bonett did testify, there was no introduction of otherwise-unavailable evidence, and given the factual context of the termination of the surveillance operation, the contents of Bonett's report were necessary for an adequate explanation of Chiarolanza's and Lacorte's actions.

20

Because the testimony about the radio report was admitted for a legitimate non-hearsay purpose, and the contents of the report were necessary to achieve that legitimate purpose, the District Court did not err under *Sallins*.

## B. Expert Testimony

Price argues that Detective Andrew Callaghan, the government's expert witness on the professional customs of drug dealers, impermissibly testified as to Price's mental state in violation of Rule 704 of the Rules of Evidence. That rule prohibits experts in criminal cases from stating an opinion

> with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed. R. Evid. 704(b). We review this claim for plain error because Price did not object to Callaghan's testimony at trial. The claim, however, is without merit and would survive scrutiny even under a more exacting standard.

Callaghan said that in his opinion, based on statistics gathered by the Philadelphia Police Department, drug dealers

are very likely to carry guns, and drug buyers almost never do.[3]

---

[3]The challenged testimony, in full, is as follows:

> I've been involved in narcotics enforcement since about 1990 or '91, and I have never arrested a person who was just buying a substance, a user, with a firearm. I'll concede that it does happen. In fact, I've been in squads where I've seen it happen. But I've made thousands of arrests, and I've never personally arrested a person who was just buying a controlled substance [for personal use] with a firearm.
>
> In fact, the statistics that I researched when I was in the intelligence unit was, in Philadelphia, in 2001 and 2002, one-sixth of one percent of drug users were arrested with a firearm in their possession.
>
> And based on my training and experience, it's more common for a person selling controlled substances to possess a firearm to protect themselves and their operation from – generally they're protecting themselves from being robbed on the streets.
>
> And another reason that a user – based on my debriefings during [my time as an] intelligence [officer], another reason why a user stays away from a firearm is, knowing and intentional possession of a controlled substance is a misdemeanor in Pennsylvania. That's just a person who's using. If that person was to carry a

It is settled law that an expert may testify about common behavior patterns in a profession or subculture. *See United States v. Watson*, 260 F.3d 301, 307 (3d Cir. 2001) (collecting cases). *Watson*, to which Price appeals for support, favors the government's position, not his. The testimony we deemed erroneously admitted in *Watson* was the expert's opinion that the defendant personally had intended to resell the drugs he purchased. That opinion, we held, contravened Rule 704, because the defendant's mental state was an element of the charged crime. *Id.* at 310.

But Callaghan, as the above quotation reveals, said not a word about Price's mental state. His testimony was entirely legitimate, as *Watson* by its plain terms explains:

> It is well established that experts may describe, in general and factual terms, the common practices of drug dealers. Expert testimony is admissible if it merely supports an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony. It is only as to the last step in the inferential process--a conclusion as to the defendant's mental state--that Rule 704(b) commands the expert to be silent.

firearm, that changes that crime to a felony.

(App. 169.)

23

*Watson*, 260 F.3d at 309 (internal quotes, citations omitted).

Callaghan's testimony was no more and no less than a description, "in general and factual terms, [of] the common practices of drug dealers."

## C. Definition of "Carry in Furtherance"

Price argues, finally, that the jury instructions failed to define the "in furtherance" component of § 922(c), and thus allowed the jury to infer that mere possession of a gun while committing a crime is sufficient for conviction. As with the previous claim, we review this claim for plain error because Price did not object to the instruction at trial.

The District Court correctly instructed the jury that the mere presence of a gun during commission of a crime is not enough for conviction, and that instead, "[i]t is sufficient [for conviction] if the proof established that the firearm furthered the commission of the crime or was an integral part of the underlying crime being committed."[4] By specifying that the gun must have "furthered" or been "integral" to the underlying crime, the instruction adequately conveyed that possession of a gun while committing a crime is not, in itself, enough for conviction under § 922(c).

---

[4]We note as a purely logical matter that the phrase "it is sufficient if" might be clearer if emended to "it is sufficient only if" or replaced with the phrase "it is necessary for." But we do not hold the given instruction to have been error, and still less to have been plain error.

## III.

For the foregoing reasons, we will affirm the judgment of the District Court.