NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3349
_____

MARY LAROCHELLE; SANDRA RIKER; EMILIA SHEARER;
CANDICE GALBREATH; NICOLE VASQUEZ

v.

WILMAC CORPORATION; WILMAC HEALTH CARE, INC;
MCWIL GROUP LIMITED; LANCASHIRE HALL

Sandra Riker; Emilia Shearer,
                                        Appellants
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-12-cv-05567)
District Judges: Hon. Lawrence F. Stengel and Marilyn Heffley
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 22, 2019
_____

Before: SHWARTZ, KRAUSE, and BIBAS, Circuit Judges.

(Filed: April 22, 2019)
_____

OPINION*
_____

SHWARTZ, Circuit Judge.

_____

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Plaintiffs Sandra Riker and Emilia Shearer brought employment discrimination claims against their former employer, Wilmac Corporation, Wilmac Health Care, Inc., McWill Group Limited, and Lancashire Hall ("the Facility") (collectively "Defendants").[1]  They alleged violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to e-17, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951-963, and Pennsylvania common law.[2]  The District Court granted summary judgment for Defendants on all of Riker's and Shearer's claims except for Shearer's retaliation claims under the ADA and PHRA. Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 669 (E.D. Pa. 2016) ("LaRochelle I"), clarified on denial of recons., No. 12-CV-5567, 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016) ("LaRochelle II").  Following a bench trial on Shearer's remaining claims,[3] the Court entered judgment for Defendants.  LaRochelle v. Wilmac Corp., No. CV 12-5567, 2017 WL 4475964 (E.D. Pa. Sept. 26, 2017) ("LaRochelle III").

Riker appeals the District Court's orders granting summary judgment to Defendants and denying her motion for reconsideration with respect to her claims for Title VII and ADA retaliation, wrongful discharge, and Title VII and PHRA hostile work environment.[4]  Shearer appeals the Court's order granting summary judgment and

---

[1] Three other Plaintiffs are not involved in this appeal.
[2] Plaintiffs Riker and Shearer withdrew their claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634.
[3] The parties consented to trial before a United States Magistrate Judge.
[4] Riker waived any challenge to her claims of associational race discrimination under Title VII and §1981 and ADA discrimination because they were "not squarely

denying her motion for reconsideration on her claims for wrongful discharge and under Title VII and § 1981 for hostile work environment,[5] as well as the trial verdict on her claims for ADA and PHRA retaliation. For the following reasons, we will affirm.

I[6]

A

We first address Riker's appeal of the order granting summary judgment on all of her claims. We begin by setting forth the relevant facts.

Defendants hired Riker as a Certified Nursing Assistant ("CNA")[7] in 2009. Riker claims that starting in 2010, CNA Teddy Bernard subjected her and other female staff to

---

argued." John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).

[5] Shearer presented no arguments challenging the dismissal of her ADA and gender discrimination claims or her Title VII and § 1981 national origin-based discrimination claims. Thus, those claims are waived.

[6] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367. We have jurisdiction under 28 U.S.C. § 1291. Our review of a district court's order granting summary judgment is plenary, Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013), and we view the facts and make all reasonable inferences in the non-movant's favor, Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

An appeal of a motion for reconsideration "brings up the underlying judgment for review." Quality Prefabrication Inc. v. Daniel J. Keating Co., 675 F.2d 77, 78 (3d Cir. 1982). By appealing the order denying reconsideration of an order granting summary judgment, Plaintiffs essentially argue that the District Court erred in granting summary judgment.

[7] CNAs are "principal caregivers" who "help care for ill, injured, disabled, or infirm individuals confined to nursing facilities" by, among other things, serving meals, assisting with personal care, and performing light cleaning. App. 1156. Charge Nurses

3

sexual harassment and that she complained to supervisors about Bernard's behavior several times before June 2011. In June 2011, Riker informed the Director of Human Resources that Bernard came from behind and hugged her, that his "behavior has largely been ignored by licensed staff," and that she "fear[ed] retaliation" for reporting his conduct. App. 1160. Bernard was suspended pending the investigation and ultimately terminated.

During 2011, Riker sought workers' compensation for two injuries she identified as work-related.[8] The last day Riker worked for Defendants was in early January 2012. In early January, Riker's physician told her that she could return to work later that month if she performed light duty with weight restrictions. Riker faxed this report to the Director of Human Resources. The Director of Human Resources informed Riker that Defendants would not accommodate non-work-related injuries. Riker subsequently filed for unemployment compensation and began collecting unemployment benefits the first week of February 2012.[9]

In February 2013, Riker signed, and a workers' compensation court approved, a compromise and release agreement ("C&R"), "full[y] settl[ing] . . . all claims against [Defendants] for all injuries Claimant sustained on 10/30/11 or 2/1/11 or at any other

supervise CNAs. The Charge Nurses, in turn, are overseen by the Shift Supervisors, who in turn report to the Director of Nursing ("DON").

[8] Defendants' Workers' Compensation Policy provides in relevant part that "[a]ll employees are covered by Worker's Compensation insurance when a job injury or work-related illness occurs" and "[e]mployees must report all work-related injuries immediately to their charge supervisor." App. 889.

[9] An employee can be eligible for unemployment benefits if she takes a leave of absence due to health problems.

4

time Claimant was employed by Defendant." App. 1177. On the same day, Riker signed a letter of resignation stating in full: "I Sandra Riker hereby voluntarily resign my employment from Lancashire Hall/McWill Group. This resignation is voluntary. I was not coerced by anyone into making this decision." App. 1187. Riker was represented by counsel when she signed these documents and testified before the workers' compensation court that she read and understood the C&R and related documents, including the resignation.

1

Viewing these facts in Riker's favor, we examine Riker's claim that Defendants violated Title VII and the ADA by retaliating against her for reporting sexual harassment and for seeking work-related injury accommodations, and that they wrongfully discharged her for engaging in the protected activity of filing workers' compensation claims. The Title VII and ADA claims are assessed under the McDonnell Douglas framework, the first step of which involves evaluating plaintiff's prima facie case. Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 364 (3d Cir. 2008). To state a prima facie case for retaliation under the federal employment statutes, Riker must establish that (1) she engaged in protected activity, (2) Defendants took an adverse employment action against her, and (3) there is a causal link between the protected activity and Defendants' adverse action. See Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (retaliation). Similar to the adverse-employment-action requirement of the federal employment statutes, a Pennsylvania common law claim for wrongful discharge requires,

at a minimum, retaliatory termination. See Weaver v. Harpster, 975 A.2d 555, 563 (Pa. 2009).

Riker fails to show that Defendants terminated her or took an adverse action against her. Riker voluntarily resigned in February 2013. Voluntary resignation is not an adverse employment action. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186 (4th Cir. 2004) (explaining that unless there is a claim for constructive discharge— which Riker does not make—voluntary resignation does not constitute adverse employment action); cf. Leheny v. City of Pittsburgh, 183 F.3d 220, 227 (3d Cir. 1999) ("If a[] [government] employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights."). Moreover, Riker resigned with the assistance of counsel and as part of a court proceeding where she had the opportunity to ask the workers' compensation judge about it. This circumstance undercuts the conclusory affidavit of her coworker and her self-serving affidavit claiming that Defendants' lawyers told her she "had to sign a resignation or [she] could not settle," and that she was terminated a year prior to the resignation letter.[10] SA 240 ¶ 22; see Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009).

---

[10] Defendants claim that prior to the voluntary resignation, Riker took a leave of absence for health reasons. Specifically, in a questionnaire Defendants submitted to the state in April 2012, they indicated that Riker "voluntarily quit for health/medical reasons, went on a leave of absence." App. 1455. The Director of Human Resources sent Riker letters in April and May 2012 regarding Riker's obligation to pay her health insurance

6

Because Defendants did not terminate or take an adverse employment action against Riker, the District Court properly granted summary judgment for Defendants on Riker's retaliation and wrongful discharge claims.

2

The District Court also properly dismissed Riker's Title VII and PHRA hostile work environment claims. To establish a Title VII hostile work environment claim, a plaintiff must

> show that 1) the employee suffered intentional discrimination because of his/her [membership in a protected class such as sex], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability.

Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (internal quotation marks an citations omitted). "The first four elements of this claim establish that a hostile work environment existed. The fifth element . . . establishes the basis on which to hold the employer liable." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009). Employers are liable for the actions of a plaintiff's non-supervisory coworkers "only if [(1)] the employer failed to provide a reasonable avenue for complaint or . . . [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." In re Tribune Media Co., 902 F.3d 384, 400 (3d Cir. 2018) (alterations in original) (quoting Huston, 568 F.3d at 104). The elements

---

premium because she had put herself on leave when she could not return to work. This evidence thus shows that Riker was on leave and had not been fired.

for a PHRA hostile work environment claim are "coextensive[]" with a Title VII hostile work environment claim. Atkinson v. LaFayette Coll., 460 F.3d 447, 454 n.6 (3d Cir. 2006).

Riker concedes that Bernard was a non-supervisory co-worker, but nonetheless contends that the District Court erred by dismissing her hostile work environment claim because the Court should not have accepted Defendants' "blanket defense" that they were unaware of Bernard's harassment until they received Riker's letter in June 2011. Appellants' Br. at 37. The record, however, shows that the first time Riker complained about Bernard's actions towards her was in June 2011, and Defendants promptly investigated and terminated him. Riker only offers her own statements as evidence that Defendants knew of Bernard's harassment prior to June 2011, but these "conclusory, self-serving" statements are "insufficient to withstand a motion for summary judgment" on her hostile work environment claim. Kirleis, 560 F.3d at 161 (internal quotation marks and citation omitted). Therefore, the Court properly granted summary judgment for Defendants on Riker's Title VII and PHRA hostile work environment claims.

B

We next turn to Shearer's challenges to the District Court's summary judgment rulings on her wrongful discharge as well as her Title VII and § 1981 hostile work environment claims. We will first set forth the relevant facts drawn from the summary judgment record.

Shearer initially worked on the Baker Wing but asked to be transferred because a coworker refused to work with her due to her nationality and criticized the way she spoke

8

English and cared for residents. She was transferred to the Rehab Wing, where she claims that one Charge Nurse called her offensive names and instructed other staff not to assist her, and the other Charge Nurse tolerated the first's discriminatory comments, assigned her harder tasks, and accused her of faking injuries. At some point, Shearer was transferred back to Baker Wing.[11]

During a shift one morning in September 2011, Shearer fell while assisting a resident. Riker and a Charge Nurse heard but did not see Shearer fall and helped her from the floor. Later during that shift, Shearer told a resident not to touch items on the clean linen cart with his dirty hands. Shearer was accused of yelling at the resident in violation of the Resident Abuse Policy.[12] Shearer denied yelling at the resident but admitted that she has "a loud voice" and she was "a distance away" from the resident and the linen cart. App. 716 ¶ 33. Before leaving the facility that day, Shearer reported both the fall and the incident with the resident to the Shift Supervisor.

The Director of Nursing ("DON") called Shearer at home after her shift and informed her that she was suspended pending investigation of the alleged abuse. Shearer returned to the facility and provided a statement to the DON, and then reported to the Director of Human Resources that she had fallen and was injured during her shift. The Director of Human Resources had her fill out an incident report regarding the fall, and

---

[11] Her return to Baker Wing appears to have occurred while she was on light duty following an October 2010 or July 2011 injury.

[12] The Resident Abuse Policy provides that "all residents residing in [Defendants'] facilities deserve to live in a safe and protected environment from any form of verbal, mental, sexual, or physical abuse" and "[w]hen an employee is alleged to have abused a resident . . . the incident will be investigated." App. 643.

9

instructed her to see Defendants' workers' compensation physicians.[13]  At her

appointment the following day, she was diagnosed with various sprains and strains and

put on light duty.  The workers' compensation doctor sent Defendants his report, which

included the light duty restriction.

In her investigation of the alleged abuse, the DON obtained statements from

employees who were working at the time of the incident and concluded that the

allegations were substantiated.  Defendants thereafter terminated Shearer's employment

for "resident abuse."  App. 894.

1

Shearer asserts that "by reporting a workplace injury to her employer" she

"engaged in a protected activity that triggered public policy anti-retaliation protection,"

and her termination "establish[ed] a claim of Wrongful Discharge."  Appellants' Br. at

32.  Shearer is mistaken.  Wrongful discharge claims based on filing workers'

compensation claims require both (1) reporting the injury to the employer and

(2) "express[ing] [an] intent" to the employer to file a workers' compensation claim.

Smith v. R.R. Donnelley & Sons Co., Civ. No. 10-1417, 2011 WL 4346340, at *5 (E.D.

Pa. Sept. 16, 2011); cf. Owens v. Lehigh Valley Hosp., 103 A.3d 859, 869 (Pa. Commw.

Ct. 2014) (holding that "a cause of action exists under Pennsylvania law for wrongful

---

[13] Shearer claims that this injury was "instantly reported" because a Charge Nurse heard her fall and helped her from the floor.  App. 690 ¶ 20, 715 ¶ 30.  Shearer also claims that when she reported both her fall and the abuse allegation to her Shift Supervisor, the Shift Supervisor told her that she could fill out the paperwork when she returned for her next shift.  The Shift Supervisor's statement confirms that Shearer reported the fall before the end of her shift.

10

discharge of an employee who files a claim for workers' compensation benefits with an employer [even where the employee] has not filed a claim petition with the Bureau"). Assuming Shearer reported her injury to the proper supervisor, the mere fact that she filled out an incident report stating she fell at work does not mean that she expressed to Defendants her intent to file a workers' compensation claim. Accordingly, the District Court did not err in its determination that Shearer presented no evidence that she notified Defendants of an intent to file a workers' compensation claim and therefore summary judgment for Defendants on her wrongful discharge claim was warranted.

2

Summary judgment in Defendants' favor was also appropriate on Shearer's hostile work environment claim. Shearer asserts that "[s]he was the target of ridicule and false accusations," because of her national origin and the way she speaks. Appellants' Br. at 31. The isolated comments Shearer describes, while distasteful, do not establish a hostile work environment. Moreover, she was transferred to the Rehab Wing when she originally complained of harassment in the Baker Wing, and when she complained about treatment in the Rehab Wing, she was transferred back to the Baker Wing, where, at that point, she was working under different supervisors. Thus, Defendants remediated the alleged harassment by moving her from work areas where she claimed to have been mistreated. See Suders v. Easton, 325 F.3d 432, 461 (3d Cir. 2003) ("When confronted with allegations of . . . harassment, employers have a wide range of options, including terminating the offending supervisor or stepping in and removing the victim from the hostile work environment by, for example, a transfer."), vacated on other grounds sub

11

nom. <u>Pa. State Police v. Suders</u>, 542 U.S. 129 (2004). Accordingly, the District Court correctly granted summary judgment for Defendants on Shearer's hostile work environment claim.

## II

We now turn to Shearer's challenges to the District Court's verdict in favor of Defendants on her ADA and PHRA retaliation claims. Shearer seeks to overturn the verdict based upon (1) an evidentiary ruling and (2) purported misapplication of the pretext standard.[14]

## A

At trial, Shearer testified that she tripped over a wheelchair and fell during her shift. Riker and a Charge Nurse heard but did not see her fall and rushed to assist her from the floor.[15] Despite the fall, Shearer continued working.

Toward the end of Shearer's shift, she saw a resident known to have hygiene issues across the hallway helping himself to items on the clean linen cart and she loudly instructed him not to touch the cart and told him that she would assist him as soon as she

---

[14] "On appeal from a bench trial, our court reviews a district court's findings of fact for clear error and its conclusions of law <u>de novo</u>. For mixed questions of law and fact we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review. To the extent that the District Court's conclusions rested on credibility determinations, our review is particularly deferential." <u>VICI Racing, LLC v. T-Mobile USA, Inc.</u>, 763 F.3d 273, 282-83 (3d Cir. 2014) (internal quotation marks and citations omitted); <u>accord</u> <u>Frederick L. v. Dep't of Pub. Welfare of Pa.</u>, 364 F.3d 487, 491 (3d Cir. 2004) (appeal following bench trial in employment discrimination case).

[15] This Charge Nurse testified that while she supervised CNAs, including Shearer on occasion, Shearer was not under her supervision at the time of the accident.

finished her tasks. Shearer testified that she warned a CNA on the next shift, who had been closer to the clean linen cart than Shearer during the interaction with the resident, that the resident was upset. Shearer also testified that the other CNA told Shearer that Shearer was rude to the resident.[16] This CNA later reported to the DON that Shearer was abusive to the resident. Riker and a Charge Nurse both testified that they heard part of the interaction between Shearer and the resident and did not think Shearer acted inappropriately. Shearer testified that, at the end of her shift, she told her Shift Supervisor about both her fall and the incident with the resident.

Pursuant to the Resident Abuse Policy, Shearer was suspended pending the abuse investigation. During the investigation, the DON collected statements regarding the allegations including from Shearer, a social worker who spoke to the resident, two CNAs from the morning shift, and a Charge Nurse who witnessed the incident. The DON conceded that she did not have statements from the Charge Nurse who testified that she witnessed the interaction or the Shift Supervisor to whom Shearer reported the incident.[17] The DON further testified that she did not investigate whether the resident presented a safety concern because "[her] investigation was in regards to [Shearer's] behavior towards the resident," and not "the infection control policy." App. 3446. When asked whether Shearer was engaged in the type of "medically required" loud voice excluded from the resident abuse policy, App. 3009, she responded "[y]ou do not need to raise

_____

[16] Two witnesses testified that the CNA who reported the alleged abuse specifically disliked Shearer.

[17] Riker, who was assigned to the resident and heard part of Shearer's interaction with him, testified the DON never asked Riker about the alleged abuse.

13

your voice to have conversation with [the resident]. So it wasn't medically necessary for her to raise her voice," App. 3446. The DON testified that Shearer was fired because "she yelled at the resident, raised her voice to unacceptable tone and was redirecting the resident from the area he was permitted to be in." App. 3491.

Shearer saw Defendants' workers' compensation doctor the morning after the incident and was put on modified duty. She was discharged from care and permitted to resume full duty work approximately two weeks later, but by then she had been terminated.

## B

Shearer argues that the District Court erred by admitting the unverified handwritten statements the DON collected in the course of her investigation. These statements were in Shearer's personnel file and, therefore, Defendants sought to introduce them (1) under the business records exception to the hearsay rule, and (2) as nonhearsay evidence of what the DON considered in reaching her decision to terminate Shearer. The Court overruled Shearer's objection, deemed the statements nonhearsay, and considered the DON's reliance on these statements in its findings of fact. See LaRochelle III, 2017 WL 4475964, at *4 & n.4.

The District Court correctly admitted these nonhearsay statements because they were not offered to prove whether Shearer abused the resident.[18] See Fed. R. Evid. 801(c)(2). Rather, because Defendants offered these statements "to explain why" they

---

[18] "Whether a statement is hearsay is a legal question subject to plenary review." United States v. Price, 458 F.3d 202, 205 (3d Cir. 2006).

terminated Shearer, that is, "for the statements' effect on the listener—those statements [were] not offered for their truth. Therefore, they [are] admissible for a non-hearsay purpose." United States v. Edwards, 792 F.3d 355, 357 n.2 (3d Cir. 2015). As a result, the Court did not err in admitting the statements.

C

Shearer also argues that the District Court erred by entering judgment in favor of Defendants because she established a causal connection between her protected activities and her termination "a mere three . . . days after she reported a work injury and two . . . days after her request for accommodation" and because Defendants' investigation into the alleged abuse was inadequate. Appellants' Br. at 52.

To prove causation at the pretext stage for an ADA or PHRA retaliation claim, the plaintiff must show that her protected activity was the "but-for" cause of the adverse employment action.[19] Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352, 362 (2013) (holding that the Title VII "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action"); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004) (noting ADA and PHRA claims involve same elements). In other words, at the pretext stage, "the plaintiff must be able to

---

[19] Causation is part of both the prima facie and pretext stages, but the type of causation that must be shown at each point differs. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000) (recognizing that causation questions asked at prima facie and pretext stages are "quite similar" but not identical). To establish causation at the prima facie stage, a plaintiff must introduce evidence about the "scope and nature of conduct and circumstances that could support the inference" of a causal connection between the protected activity and adverse action. Id. at 279.

convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997).

A plaintiff cannot merely ask a factfinder to draw inferences from temporal proximity or holes in the employer's proffered nondiscriminatory reason. "[P]roof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct. . . . [I]t is not enough . . . to dis[]believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 146-47 (2000) (alteration in original) (emphasis, internal quotation marks, and citations omitted).

Even if Shearer demonstrated that Defendants' investigation into the alleged abuse allegation was inadequate or that the timing of her termination was suspicious, the District Court had sufficient evidence to find that Shearer failed to demonstrate that the DON terminated her because she sought accommodation for her injury. See Reeves, 530 U.S. at 148. Several witnesses told the DON about Shearer's interaction with the resident and there was no evidence the DON's decision to address that conduct was influenced by Shearer's visit to the workers' compensation doctor or her need to perform light duty. Therefore, the District Court correctly entered a verdict for Defendants on Shearer's ADA and PHRA retaliation claims.

III

For the foregoing reasons, we will affirm.

16