PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-2812

──────────

UNITED STATES OF AMERICA

v.

ADAM LACERDA a/k/a Robert Klein,
Appellant

──────────

No. 15-4023

_____

UNITED STATES OF AMERICA

v.

GENEVIEVE MANZONI,
Appellant

──────────

No. 16-2220

──────────

UNITED STATES OF AMERICA

v.

IAN RESNICK,
Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. Nos. 1-12-cr-00303-001, 1-12-cr-00303-010, and
1-12-cr-00303-003)
District Judge: Honorable Noel L. Hillman

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 11, 2019

Before: McKEE, PORTER, and ROTH, *Circuit Judges*

(Filed: May 5, 2020)

_____

Mark E. Cedrone
Jesse D. Abrams-Morley
Aubrey C. Emrich
CEDRONE & MANCANO, LLC
123 South Broad Street, Suite 810
Philadelphia, PA 19109
    *Counsel for Appellant Adam Lacerda*

Robert L. Tarver, Jr.
LAW OFFICES OF ROBERT L. TARVER, JR.
66 South Main Street
Toms River, NJ 08757
    *Counsel for Appellant Genevieve Manzoni*

Michael E. Riley
LAW OFFICES OF RILEY AND RILEY
2 Eves Drive, Suite 109
Marlton, NJ 08053
    *Counsel for Appellant Ian Resnick*

Craig C. Carpenito
Mark E. Coyne
Deborah Prisinzano Mikkelsen
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102
    *Counsel for Appellee*

---

OPINION OF THE COURT

---

PORTER, *Circuit Judge.*

The Vacation Ownership Group ("VOG") billed itself as a sort of advocacy group helping victims of timeshare fraud get out of their timeshare debts. After a lengthy and complex trial, a jury determined that VOG had in fact defrauded its customers, and that Adam Lacerda, Ian Resnick, and Genevieve Manzoni were each knowing participants in that fraud. In this consolidated appeal, they now challenge their judgments of conviction, raising several claims of error. For the reasons discussed below, we will affirm their respective convictions and sentences.

## I. Background

### A. VOG's Fraudulent Activity

A timeshare is a form of shared property ownership in which multiple people own the rights to use a specific vacation or resort property. These properties are often units in a resort condominium, in which each timeshare owner has an allotted period of time to use the property. When one buys a timeshare, he typically makes a down payment on the property and finances the balance of the purchase price. These loans are commonly referred to as "mortgages" in the timeshare industry. In addition to these upfront costs, timeshare owners are also required to pay annual maintenance fees. It is not unusual for timeshare owners to fall prey to high-pressure sales tactics and commit to spending more money than they can comfortably afford. Later, they may seek to settle these debts or cancel their timeshares.

In 2009, while working for Wyndham Vacation Resorts, Inc. (a timeshare sales company), Adam Lacerda and his wife, Ashley Lacerda, founded VOG. VOG marketed itself as a timeshare consulting company and claimed that it could help customers cancel, purchase, or upgrade their timeshares.

3

Lacerda was the president and chief executive officer of VOG, and his wife was the chief operating officer. Together, they exclusively controlled VOG's bank accounts and post office box.

Lacerda created phone scripts for VOG's sales representatives to use when speaking with timeshare owners. One of these scripts was VOG's "bank settlement" pitch. This sales pitch was riddled with misrepresentations. Following this script, the VOG representatives used personal information compiled by VOG in "customer lead sheets" to make unsolicited calls to unsuspecting timeshare owners. The representatives said they were calling on behalf of a property owners' association to follow up on the owner's recent complaints. This was not true. The representatives also claimed they were working with the bank that held the loan for the owner's timeshare mortgage. This was also not true. They then promised to review the owner's account—which they could not do because they had no access to that account—and then to call the owner back.

During a follow-up call, VOG representatives offered to settle the timeshare owner's debt at a fraction of the remaining balance, for a negotiated fee. Later, during a closing call, the representatives had the timeshare owner electronically sign VOG's contract and pay its fee. The representatives then promised that the "mortgage would be paid off in full" and the timeshare owner would receive a "deed free and clear." But none of that happened. Instead, VOG just pocketed the money.

Lacerda also trained his VOG employees to use a fraudulent phone script for a timeshare "cancellation" sales pitch. Again, VOG representatives made unsolicited calls to timeshare owners and falsely told them that VOG had received their complaints, that VOG would do all the necessary work to cancel the owners' timeshares, and that cancellation would not damage the customers' credit ratings.

But VOG did not work to cancel the owners' timeshares. Instead, after receiving the timeshare owners' money, VOG sent them an eight-step process for cancelling the timeshares themselves and told them to stop making their loan payments. Eventually the timeshare owners received default

4

notices from the timeshare developers. When the owners complained to VOG, VOG instructed them to allow the developers to foreclose. Typically, this would lead to a nonjudicial foreclosure proceeding, which is common in the industry. This proceeding, Lacerda knew, would result in the cancellation of the owners' timeshare debt, but at the cost of the timeshare deed, any equity the owners had, and, of course, the owners' credit ratings.

VOG employed additional misrepresentations: Lacerda impersonated bank officials on calls, altering his voice and using a spoofing device to alter his phone number. And VOG's website falsely displayed the Better Business Bureau seal, advertising itself as an A+ rated business, and claimed to be a member of the American Resort Development Association.

Not even the names used at VOG were true. Under Lacerda's direction, VOG representatives used false names while interacting with potential customers. These false names allowed Lacerda and other former Wyndham employees to violate their non-compete agreements and hide their identity from former clients at Wyndham. This was important because VOG's customer lead sheets were comprised almost exclusively of Wyndham timeshare owners.

While employed by Wyndham, Ian Resnick sent customer lead sheets to VOG and received a kickback for every resulting sale. In August 2010, Resnick left Wyndham to join VOG full time. Using the bank settlement and timeshare cancellation scripts, Resnick defrauded several customers. Recognizing Resnick's talents, Lacerda promoted him to Senior Contract Analyst.

Genevieve Manzoni, another Wyndham-alumna, joined VOG in October 2010. As a VOG representative, Manzoni showed great initiative, inventing her own "settlement" numbers on the fly. She, too, assumed a management role, overseeing other VOG sales representatives.

In November 2010, the FBI raided VOG's offices and the Lacerdas' home. Several VOG representatives left the company following the raid, including Resnick. So Lacerda convened an office-wide meeting where his lawyers, including

5

Marc Neff, assured VOG staff that everything was okay. They told the employees that only Lacerda was under investigation, and that Neff had reviewed the sales scripts and verified that everything was legal. VOG abandoned the bank settlement pitch and revised the timeshare cancellation pitch to remove any references to working with the banks, while leaving many other misrepresentations in place. With these assurances and changes, many of VOG's representatives, including Resnick, returned and VOG resumed and expanded its operations.

Resnick continued receiving promotions, working as VOG's Director of Training, then Director of Training and Compliance, and then Vice President of Sales and Compliance. While receiving compensation at VOG, Resnick and Manzoni also obtained unemployment benefits from New Jersey.

## B.  Trial of VOG Defendants

In April 2012, Lacerda, Resnick, Manzoni, and several other VOG employees were arrested after being charged with various counts of mail and wire fraud. VOG then changed its name to VO Financial and continued operations, still using the same misrepresentation-riddled sales pitches. Later, a superseding indictment was filed charging Lacerda, Resnick, Manzoni, and fifteen other VOG employees with conspiracy to commit mail and wire fraud. Lacerda was also charged with nine counts of mail fraud and three counts of wire fraud arising from his VOG scheme, and a final count of mail fraud for wrongfully receiving unemployment benefits while he was employed and receiving compensation at VOG.[1] Resnick was charged with two counts of mail fraud and three of wire fraud for his work at VOG, and another count of mail fraud for his unemployment fraud. And Manzoni was charged with one count of wire fraud for her work at VOG and a separate count of wire fraud for, allegedly, wrongfully receiving unemployment benefits. Other VOG employees received similar charges.

---

[1] Lacerda, together with his wife, was also charged with conspiracy to commit money laundering and four counts of money laundering, but these were dismissed by order of the District Court as a matter of law.

Most of the VOG defendants negotiated plea agreements with the government. But five defendants—Adam and Ashley Lacerda, Resnick, Manzoni, and Joseph DiVenti—took their cases to trial. Relevant to this appeal, about four and a half months before trial, the District Court disqualified Lacerda's then-attorney, Neff, as a potential witness and denied replacement counsel's requested continuance. It also denied Manzoni's motion to sever her VOG-related fraud charges from her unemployment-related fraud charges.

The government's first witness at trial was FBI Special Agent John Mesisca, an experienced agent in wire and mail fraud investigations and the lead investigator in the case. Mesisca was allowed, over appellants' objections, to provide an extensive overview of his investigation. During trial, again over appellants' objections, the District Court also excluded certain hearsay evidence and allowed other evidence for impeachment purposes.

The jury returned guilty verdicts on all counts related to Lacerda. The District Court sentenced him to 324 months imprisonment with three years of supervised release, and it ordered him to pay restitution of $2,679,656.09. The jury also found Resnick guilty on all counts related to him. The District Court sentenced him to 216 months imprisonment with three years of supervised release and ordered him to pay restitution of $2,735,142.99. While the jury found Manzoni guilty of both the conspiracy charge and wire fraud in relation to her work at VOG, it acquitted her on the charge of unemployment fraud. The District Court entered judgment against Manzoni on the conspiracy and mail fraud charges, sentenced her to 42 months imprisonment with three years of supervised release, and ordered her to pay restitution of $105,422.[2] The District Court also ordered the forfeiture of all of VOG's gross proceeds.

This appeal follows. The District Court had jurisdiction over the several crimes charged in this case under 18 U.S.C. § 3231. We have jurisdiction over appeals from final judgments and orders under 28 U.S.C. § 1291.

---

[2] The jury also found Ashley Lacerda guilty on all remaining counts but acquitted Joseph DiVenti.

## II.    Overview Testimony

### A.    Proper Overview Testimony Is Admissible

Special Agent Mesisca's testimony, including both cross and redirect examination, would extend into the third day of trial. On appeal, Lacerda, Resnick, and Manzoni each take issue with Mesisca's testimony, arguing that it constituted impermissible overview testimony. We have never addressed the permissible scope and limits of overview testimony in a precedential opinion.

Our sister circuits, however, have reviewed overview testimony. They have analogized it to summary testimony. *See, e.g., United States v. Moore*, 651 F.3d 30, 55–56 (D.C. Cir. 2011). The main difference between summary and overview testimony is that summary testimony comes at the end of trial and overview at the beginning, but both try to connect the dots and convey the big picture to the jury in complex prosecutions. *United States v. Banks*, 884 F.3d 998, 1023 (10th Cir. 2018).

Summary evidence may be safer because the evidence that the officer is connecting has already been heard by the jury. *See Moore*, 651 F.3d at 56 (citing *United States v. Lemire*, 720 F.2d 1327, 1349, n.33 (D.C. Cir. 1983)). Because witnesses can change their stories and objections may be sustained, some of the testimony relied on during the initial overview may never materialize at trial. *United States v. Casas*, 356 F.3d 104, 119–20 (1st Cir. 2004).

Vouching is also a problem with overview testimony. *See Moore*, 651 F.3d at 56–57. Under Federal Rule of Evidence 608(a), a party can only bolster the credibility of a witness after that witness's credibility has been attacked. Because overview testimony is the first testimony offered, no witness's credibility has yet been attacked. Vouching for a witness who has not yet testified would, therefore, be inappropriate.

Another serious problem with overview testimony is that it sometimes relies on anticipated witnesses. Thus, it may violate confrontation rights. Testimonial statements cannot be offered against a defendant without the opportunity for cross examination. *Crawford v. Washington*, 541 U.S. 36 (2004). If overview testimony previews the answers of an anticipated

witness, such a violation is not easily cured if the expected witness later fails to testify.

The D.C. Circuit has explained:

> Because a witness presenting an overview of the government's case-in-chief runs the serious risk of permitting the government to impermissibly "paint a picture of guilt before the evidence has been introduced," and may never be introduced, we join the circuits that have addressed the issue in condemning the practice.

*Moore*, 651 F.3d at 60 (citations omitted).

The D.C. Circuit concluded that the government could call as its first witness a law enforcement officer, who is either familiar with the investigation or was personally involved, to explain how the investigation began, what law enforcement entities were involved, and what techniques were used. *Id*. at 60–61. However, the overview witness could not opine on the ultimate issues of guilt, anticipate evidence that the government hoped to introduce, or express an opinion about the strength of that evidence or the credibility of any potential witnesses. *Id*. at 61; *see also United States v. Rosado-Perez*, 605 F.3d 48, 55 (1st Cir. 2010) (cautioning, before government has presented supporting evidence, against presenting an overview of criminal investigation in which witness did not participate); *United States v. Brooks*, 736 F.3d 921, 930 (10th Cir. 2013) (allowing overview based on personal knowledge, not on hearsay nor on an opinion of defendant's guilt); *but see United States v. Khan*, 794 F.3d 1288, 1300 (11th Cir. 2015) (overview proper where officer had personal knowledge of evidence due to officer's role as lead investigator and his review of evidence).

We join our sister circuits and now hold that overview testimony that opines on ultimate issues of guilt, makes assertions of fact outside of the officer's personal knowledge, or delves into aspects of the investigation in which he did not participate is inadmissible. But an officer who is familiar with an investigation or was personally involved may tell the story of that investigation—how the investigation began, who was

9

involved, and what techniques were used. In addition, with proper foundation, he may offer lay opinion testimony and testify about matters within his personal knowledge.

### B. Summary of Special Agent Mesisca's Overview Testimony

Having determined the applicable rule, we now return to the appellants' objections to Special Agent Mesisca's overview testimony. Evidentiary objections are generally reviewed for an abuse of discretion. *United States v. Georgiou*, 777 F.3d 125, 143 (3d Cir. 2015). This standard applies to the admission of overview testimony. *See Rosado-Perez*, 605 F.3d at 54 (citing *Hall*, 434 F.3d 42, 56–57 (1st Cir. 2006)). However, although district courts are "ordinarily afforded broad discretion to determine the manner in which evidence will be received," in light of the pervasive risks of unfair prejudice, overview testimony requires closer review. *Moore*, 651 F.3d at 58. Nevertheless, even if we find error in the admission of overview testimony, we can still affirm if the error was harmless. *Rosado-Perez*, 605 F.3d at 54.

Applying our holding here, the District Court did not commit reversible error in admitting Mesisca's testimony. Mesisca testified about his background, experience, and qualifications as the lead investigator in this case. He explained that the FBI had received a complaint about VOG from a timeshare developer, Flagship. Following a meeting with representatives of that company, Mesisca opened an investigation into VOG. He explained how he had subpoenaed VOG's bank records and explained why certain checks were significant to his investigation.

Mesisca interviewed potential victims, including people identified by Flagship and others whose names appeared on the checks. He also interviewed former VOG employees and conducted several undercover phone calls to obtain evidence from VOG. With this evidence, he applied for and obtained search warrants for VOG's headquarters and the Lacerdas' personal residence.

The evidence, collected from Mesisca's search, included purchase agreements, settlement and cancelation

contracts, emails and complaints from concerned victims, customer lead sheets, client information forms, and phone scripts used at VOG. His testimony provided the foundation for admitting this evidence as exhibits, and then, as with the bank records, he explained why the evidence was significant to his investigation.

Mesisca testified that both Lacerda and his wife had control of VOG's account. While the account received many deposits, no money from the account was used to pay off any timeshare debts. Instead, the Lacerdas used the money to buy a dog, a swimming pool, and similar things.

Mesisca learned that some former Wyndham customers may have been victimized by VOG. One victim had received a phone call from "Robert Klein" representing VOG. Mesisca subpoenaed the caller's phone records and discovered that the phone number was used by VOG, after incoming calls were forwarded to a local number in New Jersey. He also learned that "Robert Klein" was an alias for Lacerda.

At the trial, Mesisca discussed the evidence he obtained through execution of the search warrant at VOG's headquarters, laying the foundation for the admission of exhibits and explaining their importance to the investigation. He further explained the sales pitches used by VOG, based on the notes, emails, and phone scripts found at the office during the search, and illustrated many of the misrepresentations VOG representatives had made to victims.

Mesisca obtained press releases issued by VOG and visited its website to collect more information and evidence. His testimony provided the foundation to enter this evidence as exhibits at trial. He also explained that, during his investigation, he met with informants who shared with him a video recording of a VOG employee training session. His testimony provided the foundation for entering this video recording into evidence. He was able to show, from his investigation, that Manzoni was working at and receiving income from VOG in October 2010, and Resnick was receiving income from VOG while collecting unemployment benefits in September and October 2010.

11

During the execution of the search warrant, Mesisca interviewed Lacerda. Lacerda advised him that he was the president and CEO of VOG and, contrary to the company's sales pitches, that VOG was not associated with any bank, that it had no ability to pay off anyone's mortgage or loan, and that it did not settle anyone's debts. Lacerda acknowledged that his sales force used aliases but claimed that was only to induce outsiders to believe VOG was larger than it really was. Lacerda admitted that he used the VOG business account for personal expenses but claimed that he took only about $30,000. Mesisca's investigation, showed that number was closer to $600,000. Lacerda admitted receiving unemployment benefits but claimed he had repaid those. Finally, Mesisca noted that, at the end of the interview, Lacerda refused to sign a statement that he had been truthful during the interview.

Mesisca also interviewed Resnick who recounted that he worked as VOG's premier closer: when other employees failed to complete a deal with a client, the information was sent to him to close it. A couple of weeks later, Mesisca again met with Resnick. During that second interview, Resnick acknowledged that he, too, had been a former Wyndham employee and that he took internal lead sheets from Wyndham and used them at VOG to call potential clients. Resnick admitted that he had collected unemployment benefits while working at VOG but claimed that he planned to repay the money.

Mesisca interviewed Manzoni on three occasions. She admitted that VOG representatives told potential clients that the representatives worked with banks—it was part of the script they followed. During her August interview, she told Mesisca that, disillusioned with VOG, she had quit.

We have set out Mesisca's direct examination testimony to show that it was proper overview. It was limited to an account of his investigation, his personal observations, and his beliefs of what the evidence showed based on what he saw and heard and did. Also important is the testimony Mesisca did *not* offer. Because he was not directly involved in the execution of the warrant at the Lacerdas' home, Mesisca did not tell the jury about that portion of the investigation. He only provided the foundation to admit evidence found at the Lacerdas' house that

12

he had personally reviewed, and then related that evidence to bank records he had previously obtained While he noted that each of the defendants had been interviewed when the search warrant was executed at VOG, he did not discuss the statements made that day by Ashley Lacerda, DiVenti, or Manzoni because he did not personally conduct those interviews.

### C. Special Agent Mesisca's Overview Testimony Was Admissible

On appeal, Lacerda, Resnick, and Manzoni each highlight the length of Special Agent Mesisca's testimony, as though that alone proves he gave impermissible overview testimony. Not so. This was a complex case in which, as lead investigator, he was directly involved in almost every step of the investigation.

Lacerda and Manzoni each further assert that Mesisca offered conclusory statements of their guilt by referring to persons who the government alleged were defrauded by VOG as "victims." The appellants have cited no authority, and we are aware of none, prohibiting government witnesses from referring to persons as "victims" who are alleged to be victims in the indictment. That there had been victims was not even disputed—it was highlighted by Lacerda and Resnick during their opening statements. Assertions to the contrary notwithstanding, whether there were victims was not at issue in this case. The issue was whether *these defendants* had defrauded the victims, or otherwise knowingly participated in the fraud occurring at VOG. The jury understood this and, finding insufficient evidence of guilt for one of the defendants, acquitted DiVenti.

Lacerda also asserts that Mesisca gave conclusory testimony, without foundation. For example, he testified that "Robert Klein" was Lacerda's alias. This issue was not preserved by any objection, *see* Fed. R. Crim. Pro. 51(b), and, having not attempted to show plain error, Lacerda is not entitled to review of this unpreserved issue on appeal. *See*

*United States v. Olano*, 507 U.S. 725, 732 (1993).[3] But even had this issue been preserved, there was in fact foundation for Mesisca's testimony: he testified that, during their execution of the search warrant at VOG headquarters, agents had found a list of names with aliases at the receptionist's desk. "Robert Klein" was listed as the alias for Lacerda, and Mesisca did not find evidence that anyone else ever used that alias.

We have reviewed the appellants' other allegations of improper overview, *e.g.*, the reason for having duplicate copies of client information sheets, whether victims were told about non-judicial foreclosure process, whether Lacerda "freaked out" when he saw one of VOG's representatives using the "bank pitch" in an email to a victim. etc. After careful review and consideration of the permissible limits of overview as set out above, we find no abuse of discretion in the admission of Mesisca's testimony.

In sum, the government may call as its first witness an officer who is familiar with, or was personally involved in, the criminal investigation, and that officer may testify about all matters within his personal knowledge from the investigation. Special Agent Mesisca's testimony was largely confined to telling the story of his investigation: how it began, the steps he took, the evidence he uncovered, and the interviews with defendants he conducted. The District Court did not abuse its discretion by allowing this testimony.

## III. Objections Raised by Lacerda

Lacerda raises several additional issues on appeal. He asserts that the District Court (1) abused its discretion when it disqualified his counsel, Marc Neff, based on Neff's conflict of interest; (2) abused its discretion when it denied replacement counsel's motion for a continuance; (3) abused its discretion by excluding from evidence an email sent by Lacerda to VOG's former CFO, Jeff Sawyer; (4) abused its sentencing

---

[3] Lacerda takes issue with additional portions of Mesisca's testimony unpreserved by timely objection but has not attempted to show plain error entitling him to review of these unpreserved issues. So we decline to address these unpreserved issues in this opinion.

discretion; and (5) erred by ordering the forfeiture of all VOG's gross proceeds. We will address each issue in turn.

### A.  Attorney Neff Was Properly Disqualified

Lacerda argues that the District Court arbitrarily disqualified his counsel of choice or at least abused its discretion by disqualifying Neff. When a defendant challenges the District Court's decision to disqualify his counsel of choice, we apply a bifurcated standard of review: first, we exercise plenary review when determining whether the District Court's decision was arbitrary, and then, if not arbitrary, we review the decision for an abuse of discretion. *United States v. Stewart*, 185 F.3d 112, 120 (3d Cir. 1999). Here, we find that the District Court's decision was neither arbitrary nor an abuse of discretion, so we will affirm.

The Sixth Amendment to the United States Constitution guarantees the right of counsel to every criminal defendant. That guarantee has generally been understood to encompass a right to the counsel of choice. *Powell v. Alabama*, 287 U.S. 45, 53 (1932). But the right to counsel of choice is not absolute. *Wheat v. United States*, 486 U.S. 153 (1988). "The essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id*. at 159 (internal citations omitted). Before disqualifying a defendant's counsel of choice, the trial court must balance that defendant's right to his counsel of choice against the fair and proper administration of justice. *United States v. Voigt*, 89 F.3d 1050, 1074 (3d Cir. 1996). When "considerations of judicial administration supervene," such as when an attorney has a serious potential conflict of interest, the presumption in favor of counsel of choice is rebutted and the right must give way. *Id*. at 1074–75 (citing *Fuller v. Diesslin*, 868 F.2d 604, 607 n.3 (3d Cir. 1989)).

Here, the District Court weighed Lacerda's right to counsel of choice against Neff's serious actual and potential conflicts of interest and, ultimately, determined those conflicts could neither be waived nor cured by anything short of disqualification. That conclusion was neither arbitrary nor an abuse of discretion.

15

After the FBI raid on VOG in November 2010, Lacerda retained Neff as his counsel. The following month, Neff met with VOG employees to ease any concerns they had, assuring them that (1) only the Lacerdas were under investigation by the FBI and (2) the post-raid revised phone scripts were lawful. VOG continued operations using the phone scripts whose legality had been vouched for by Neff. Contrary to Neff's representations, 18 VOG employees, including the Lacerdas, were eventually indicted in this criminal case based in part on their use of the phone scripts. In proffers to the government, several of those defendants told of the December meeting with Neff.

In *United States v. Merlino*, 349 F.3d 144, 151 (3d Cir. 2003), we recognized that "[a]n attorney who faces criminal or disciplinary charges for his or her actions in a case will not be able to pursue the client's interests free from concern for his or her own." We also recognized the potential conflicts that arise when counsel realistically could be called as a witness, as "it is often impermissible for an attorney to be both an advocate and a witness." *Id*. at 152. And we noted "that disqualification may also be appropriate where it is based solely on a lawyer's personal knowledge of events likely to be presented at trial, even if the lawyer is unlikely to be called as a witness." *Id*. (citing *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993)). Each consideration applies here and was central to the District Court's thorough and well-reasoned decision disqualifying Neff.

## B. The District Court Did Not Abuse Its Discretion in Managing the Trial Calendar

After Neff was disqualified, Lacerda's new counsel, Mark Cedrone, requested a lengthy continuance to prepare for trial. The District Court denied this request. Lacerda now challenges that denial on appeal. "We review the trial court's refusal to grant a continuance for an abuse of discretion." *United States v. Olfano*, 503 F.3d 240, 245 (3d Cir. 2007). Finding no abuse of the District Court's discretion, we will affirm.

"When presented with a motion for continuance, a court should consider the following factors: the efficient

16

administration of criminal justice, the accused's rights, and the rights of other defendants whose trials may be delayed as a result of the continuance." *Olfano*, 503 F.3d at 246. The District Court considered these factors and, given the time Cedrone had had to prepare Lacerda's defense, denied the motion based on the government's right to a speedy trial, efforts to streamline the case, the District Court's calendar, and the need to "protect the rights of the parties in other cases." App. 670:23–671:9.

Lacerda now argues that the District Court abused its discretion and prejudiced his defense because, he claims, Cedrone had only four months to prepare for trial. But that is inaccurate. Cedrone entered his appearance on Lacerda's behalf in November 2012—about eight months before jury selection began in July 2013—and Cedrone told the District Court in January 2013 that the scope of his representation was general and not limited to the disqualification motion. The District Court did not abuse its discretion.

### C. Lacerda's 2010 Email to Sawyer Was Properly Excluded as Hearsay

In its case-in-chief, the government presented evidence showing that Lacerda sometimes used the alias "Robert Klein" when contacting VOG customers. During the presentation of his defense, Lacerda testified that he was not the only person at VOG using that alias. On direct examination, he testified that he only began using the Robert Klein alias to respond to customer complaints that otherwise weren't being addressed by other employees who would not admit having used the moniker. He further claimed that he did not use the alias before 2010. The government used that assertion to impeach Lacerda, confronting him with a check made out to "Robert Klein" in 2009, which he had deposited into his account. On redirect, Lacerda tried to enter a 2010 email he wrote to VOG's former CFO, Jeff Sawyer, asking Sawyer to investigate who else was using the Robert Klein alias. But the District Court excluded the email as hearsay.

Lacerda now challenges the District Court's ruling on appeal. We review this evidentiary ruling for an abuse of discretion. *United States v. Frazier*, 469 F.3d 85, 87 (3d Cir.

2006). Finding no abuse of the District Court's discretion, we will affirm.

At the time of Lacerda's trial, a witness's prior consistent statement was admissible as non-hearsay only when the witness testified and was subject to cross-examination, and the out-of-court statement was offered to rebut a charge of recent fabrication or recent improper motive. *See* Fed. R. Evid. 801(d)(1)(B) (2011).[4] The Supreme Court had explained that the purpose of the exception was to rebut a charge of recent fabrication. *Tome v. United States*, 513 U.S. 150, 157–58 (1995). "Prior consistent statements [could] not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Id.* at 157.

In this case, the government did not accuse Lacerda of recently fabricating the claim that he began using the Robert Klein alias in 2010. Rather, it employed impeachment by contradiction: of course, Lacerda was using the Robert Klein alias before 2010; he profited from using the alias in 2009. Thus, under the former rules of evidence, Lacerda's email to Sawyer was hearsay, and the District Court properly excluded it.

### D.     Lacerda's Sentence Was Procedurally Sound and Substantively Reasonable

The District Court sentenced Lacerda to 324 months' imprisonment for his leading role in VOG's fraudulent enterprise. On appeal, Lacerda challenges his sentence as procedurally unsound and substantively unreasonable. Our standard of review on sentencing challenges is bifurcated. We "must first ensure that the district court committed no significant procedural error …. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard."

---

[4] Though the Rule was broadly expanded in 2014 to allow for the use of prior consistent statements to rehabilitate the witness against other forms of impeachment, *see* Fed. R. Evid. 801(d)(1)(B)(ii) (2014), the former rule, with its limitation, applied in Lacerda's case.

*Gall v. United States*, 552 U.S. 38, 51 (2007). Applying these standards, we will affirm the District Court's sentence.

## 1. The District Court's sentence was procedurally sound

Lacerda argues that the District Court imposed a procedurally unreasonable sentence because, he alleges, it was based on a miscalculation of the number of victims of the VOG scheme and the total financial loss suffered by those victims. The government bears the initial burden of proving loss by a preponderance of the evidence. *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007). The district court must then calculate the amount of loss associated with the crime of conviction and any relevant conduct that was "part of the same course of conduct or common scheme or plan." *United States v. Siddons*, 660 F.3d 699, 704 (3d Cir. 2011) (quotation omitted). While this does not have to be an exact figure, it must be a reasonable estimate. *Ali*, 508 F.3d at 145.

Lacerda first asserts that only those victims who testified during trial or whose victimization underlay a specific count of the indictment should have been counted as victims, claiming that including any other victims in the presentence investigative report ("PSR") was based on "rank hearsay." Appellant Lacerda's Br. 62–64. Of course, a district court may rely on hearsay statements during sentencing, if "they bear some minimal indicium of reliability beyond mere allegation." *United States v. Smith*, 751 F.3d 107, 116 (3d Cir. 2014) (internal quotations and citation omitted). Victim statements are reliable when they "involve[ ] matters within the knowledge of each declarant and were made in the course of interviews by one or more law enforcement officials." *Id.*

In this case, for each victim identified in the PSR, the government submitted the following:

(1) a declaration of victim losses, completed by the victims, executed under penalty of perjury, and submitted to the Probation Office;

(2) an FD-302 summarizing an officer's interview with the victim; and

(3) a canceled check verifying the amount the victim paid to VOG.

That is more than mere allegation and enough under *Smith* to show reliability. The District Court's calculation of victims was therefore reasonable.

Lacerda next argues that the District Court's calculation of loss was erroneous because it failed to offset the victims' losses with credits for new timeshares and cancellation of prior debts. This argument is unavailing. The supposed cancellation of debt was one of the bases for the fraud charges. Cancellation was not achieved through VOG's efforts, but through the victims' credit-destroying defaults with the timeshare companies after those victims stopped paying their bills—relying on VOG's misrepresentations that their timeshare debts had been paid off. And the VOG victims were trying to get rid of their timeshares, not acquire new timeshares. Neither of these were "services" rendered by VOG; they were part of the fraudulent scheme. Perpetrators of fraudulent schemes are not entitled to credits against loss for payments made to perpetuate their schemes. *See United States v. Hartstein*, 500 F.3d 790, 800 (8th Cir. 2007) ("[W]hen a defendant's only subjective intent regarding repayments relates to this illegal purpose of perpetuating the scheme, a sentencing court may refuse to credit repayments against sums received from the victims."); *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998) ("[W]e are not inclined to allow the defendants a profit for defrauding people or a credit for money spent perpetuating a fraud."); *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998) (same).

## 2. The District Court's sentence was substantively reasonable

We will not reverse a sentence as substantively unreasonable "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (*en banc*). Lacerda's Guidelines range was calculated between 324 and 405 months. As demonstrated above, Lacerda has shown no error in that calculation. The District Court's sentence of 324 months rests

20

at the very bottom of the range. When "the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness." *Gall*, 552 U.S. at 51. We will apply the presumption here.

Lacerda presents a table of cases showing a range of sentences for other fraud cases and argues that his sentence, though at the bottom of his Guidelines range, is still "23 times greater than the median sentence for his type of offense." Appellant Lacerda's Br. 67–71. When a defendant seeks to argue disparate sentencing, he bears the "burden of demonstrating similarity by showing that other defendants' circumstances exactly paralleled his, and a court should not consider sentences imposed on defendants in other cases in the absence of such a showing by a party." *United States v. Iglesias*, 535 F.3d 150, 161 n.7 (3d Cir. 2008) (citing *United States v. Vargas*, 477 F.3d 94, 100 (3d Cir. 2007)) (internal brackets and quotations omitted). Lacerda has failed to demonstrate that any of the other defendants' circumstances exactly paralleled his. So, "[a]ccording great deference" to the District Court—as the law requires, *United States v. Lessner*, 498 F.3d 185, 204 (3d Cir. 2007)—we hold that Lacerda has failed to overcome the presumption that his sentence was reasonable.

### E.  Forfeiture of VOG's Proceeds Was Not Clearly Erroneous

After finding that VOG was a wholly fraudulent scheme, the District Court ordered all its gross proceeds forfeited under 18 U.S.C. §§ 981(a)(1)(C) & 982(a)(8) and 28 U.S.C. § 2461(c). Lacerda raises two challenges to the District Court's forfeiture order on appeal. First, he asserts that he lacked sufficient notice that the government would seek forfeiture upon his conviction because the government cited the wrong criminal forfeiture statutes in its superseding indictment. Second, he asserts that the District Court's finding that all VOG's revenues were either directly or indirectly attributable to VOG's fraud, and so subject to forfeiture, was clearly erroneous. Because forfeiture orders involve mixed questions of law and fact, our standard of review here is bifurcated. We review the District Court's legal conclusions *de novo* and its findings of facts for clear error. *See United States*

*v. Gordon*, 710 F.3d 1124, 1165 (10th Cir. 2013). Applying this standard, we find no error by the District Court, and we will affirm.

### 1. *Lacerda had notice that, upon conviction, the government would seek forfeiture*

In its superseding indictment, the government gave notice that, upon conviction, it would seek forfeiture of "any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses" under 18 U.S.C. §§ 981(a)(1)(D) & 982(a)(2)(A) and 28 U.S.C. § 2461(c). App. 287. Lacerda notes, and the government concedes, that the cited criminal statutes are not the correct statutes for forfeiture of proceeds from mail and wire fraud involving telemarketing. The correct statute is 18 U.S.C. § 982(a)(8), the statute under which the District Court ordered forfeiture. Lacerda first argues that the forfeiture order cannot be based on the civil forfeiture statute because, under our precedent in *United States v. Vampire Nation*, 451 F.3d 189, 199 (3d Cir. 2006), forfeiture orders can be based on 28 U.S.C. § 2461(c) only when "there is no specific statutory provision that permits criminal forfeiture." Lacerda further argues that, by citing incorrect forfeiture statutes for his crimes, the government failed to provide the notice required by the Federal Rules of Criminal Procedure. Lacerda is mistaken on both grounds.

*First*, Lacerda's reliance on *Vampire Nation* is misguided. Our *Vampire Nation* decision was based on the language of the prior version of 28 U.S.C. § 2461(c).[5] Giving

---

[5] The applicable statute read:

> If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation *but no specific statutory provision is made for criminal forfeiture upon conviction*, the government may include the forfeiture in the indictment or information in accordance with the Federal Rules of Criminal Procedure, and upon

the words of that statute their plain meaning, we concluded that "criminal forfeiture is not permitted unless (1) a substantive provision exists for civil forfeiture of the criminal proceeds at issue; and (2) there is no specific statutory provision that permits criminal forfeiture of such proceeds." *Vampire Nation*, 451 F.3d at 199. In 2006, Congress amended the statute and eliminated the second requirement.[6] The amendment to 28 U.S.C. § 2461(c) effectively abrogates the portion of *Vampire Nation* upon which Lacerda now relies. Under the current version of the statute, the District Court correctly

---

> conviction, the court shall order the forfeiture of the property in accordance with the procedures set forth in section 413 of the Controlled Substances Act ( 21 U.S.C. 853), other than subsection (d) of that section.

28 U.S.C. § 2461(c) (2000) (emphasis added).

[6] The statute now reads:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to to [sic] the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

28 U.S.C. § 2461(c) (2006).

ordered restitution, and Lacerda had notice under the civil statute.

*Second*, the government provided Lacerda with sufficient notice under the criminal rules. Federal Rule of Criminal Procedure 32.2 sets forth the notice requirement that must be met before forfeiture can be ordered by a district court. It states:

> A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute.

Fed. R. Crim. P. 32.2(a). This rule does not require the level of specificity demanded by Lacerda. Rather, as we have held, "[a] conclusory forfeiture allegation in the indictment that recognizably tracks the language of the applicable criminal forfeiture statute" is sufficient under the rule. *United States v. Sarbello*, 985 F.2d 716, 719 (3d Cir. 1993). We recognize that *Sarbello* specifically addressed then-Rule 7(c)(2), which was removed with the 2009 amendments. But that rule was removed only because it had become obsolete: "In 2000 the same language was repeated in subdivision (a) of Rule 32.2, which was intended to consolidate the rules dealing with forfeiture." *See* Fed. R. Crim. P. 7 note (2009 Amendment). We now hold, consistent with *Sarbello*, that general notice of forfeiture is sufficient under Rule 32.2. Thus, Lacerda had sufficient notice that the government would seek forfeiture upon his conviction.

### 2. Based on its finding that VOG used its revenues to promote and facilitate its fraud, the District Court correctly ordered those revenues forfeited

Lacerda next contends that the District Court erred by subjecting all VOG's proceeds to forfeiture rather than limiting the order to the losses directly claimed by VOG's victims. But the relevant statute is not so narrow. Rather, addressing the crimes committed by Lacerda at VOG, 18 U.S.C. § 982 requires the court to

24

order that the defendant forfeit to the United States any real or personal property—

    (A) used or intended to be used to commit, to facilitate, or to promote the commission of such offense; and

    (B) constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of the offense.

18 U.S.C. § 982(a)(8). The District Court found that VOG was a fraudulent enterprise from beginning to end, and that all its gross proceeds were used to further its fraud. Based on those findings, the District Court correctly ordered the forfeiture of all VOG's proceeds.

Lacerda does not appear to challenge the District Court's findings on appeal. Instead, he argues that what it means for property to be "indirectly" derived, traceable, or obtained from an offense is ambiguous, so the rule of lenity should govern our interpretation of the forfeiture statute. We reject this argument. First, it is irrelevant. The District Court's order focused on the fact that VOG had used all its revenues to promote and facilitate its fraud, not on whether those revenues were direct or indirect. Second, "[t]he rule of lenity … is inapplicable if there is only a mere suggestion of ambiguity because most statutes are ambiguous to some degree." *United States v. Cheeseman*, 600 F.3d 270, 276 (3d Cir. 2010) (internal quotation omitted). Lacerda has failed to show that the forfeiture statute is ambiguous—much less sufficiently ambiguous—to warrant application of the rule of lenity.

Recently, the Supreme Court of the United States explained that the purpose of forfeiture statutes is to separate the criminal from his ill-gotten gains, to return, in full, the property of defrauded victims, and to lessen the economic power of criminal enterprises. *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017) (citing *Caplin & Drysdale, Ctd. v. United States*, 491 U.S. 617, 629–30 (1989)). The District Court's forfeiture order here meets those purposes. The District Court found that VOG was a thoroughly corrupt criminal

25

conspiracy from beginning to end, and that its revenue was used to promote and facilitate its crimes. That finding is supported by substantial evidence and does not appear to be challenged by Lacerda on appeal. The District Court correctly ordered the forfeiture of all of VOG's revenues.

## IV.    Objections Raised by Resnick

Like Lacerda, Resnick also raises several additional issues on appeal. He claims that (1) the government suppressed material evidence; (2) the District Court miscalculated the number of his victims and the loss amount for those victims, and so erred at sentencing; (3) his due process rights were violated when his sentencing hearing was delayed; and (4) the District Court's restitution order was procedurally unsound and substantively unreasonable. We will address each argument in turn.

### A.    The Government Did Not Commit a *Brady* Violation

Resnick asserts that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence which he might have used to impeach Special Agent Mesisca. Specifically, Resnick claims that the government withheld the documents that were the basis of a victim's, Dorothy Gerlach's, FD-302[7] and withheld Gerlach's later-produced "Declaration of Victim's Losses." Resnick preserved this argument by raising it to the District Court in a motion for a new trial based on newly discovered evidence. The District Court correctly denied that motion.

Under *Brady*, the government has a duty to disclose "evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012). Thus, there are three prerequisites to a *Brady* violation: (1) the government must have failed to disclose evidence; (2) that evidence must have been favorable to the defendant; and (3) that evidence must have been material.

---

[7] The FD-302, commonly referred to simply as a "302", is the form commonly used by FBI agents to summarize witnesses' statements and interviews.

Evidence is "material" only if there is a reasonable probability that its disclosure would have led to a different outcome at trial, and so undermines confidence in the verdict. *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). The evidence Resnick claims was withheld fails to satisfy each of the three prerequisites.

Contrary to Resnick's assertions, the government did not withhold the evidence. The documents underlying Gerlach's 302, labeled as "DG-3", were disclosed before trial. The Declaration of Victim's Losses, "DG-2", was received by the probation office in May 2013, but not forwarded to the prosecutor until late in 2014. The prosecutor disclosed the declaration with other documents in January 2015.

Resnick is correct that the failure to disclose information known only to police investigators can still implicate the prosecution, even when the prosecutor was unaware of the information. *Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006). But probation officers in the federal system are not police investigators; they are "the court's eyes and ears and provide information and recommendations to the court." *United States v. Amatel*, 346 F.3d 278, 279 (2d Cir. 2003). We will not impute to the prosecution the Probation Office's failure in 2013 to disclose Gerlach's "Declaration of Losses" to Resnick.

But even if we did impute to the prosecution the Probation Office's failure to disclose, it still would not constitute a *Brady* violation. Far from being material evidence that could have undermined Resnick's conviction, this evidence reinforces the jury's verdict. Resnick admitted that "he pitched a bank settlement deal to Ms. Gerlach." App. 7737:19–21. There were two parts to the bank settlement pitch: VOG promised to help the victims pay off their debt and keep their timeshare property, and then, in a bait and switch, sold them a second timeshare through VOG. Gerlach's declaration, which expresses confusion over not receiving points she was promised, highlights that bait and switch. Thus, the declaration was not exculpatory; it was inculpatory.

We conclude that the government did not violate its obligations under *Brady*.

27

**B.** **The Timing of Resnick's Sentencing Did Not Violate His Sixth Amendment or Due Process Rights**

Resnick next claims that his speedy sentencing rights were violated when his sentence was not imposed for more than two-and-a-half years following his conviction. We once recognized a right to a speedy sentencing hearing under both the Sixth Amendment and the Due Process Clause. *See Burckett v. Cunningham*, 826 F.2d 1208, 1219–21 (3d Cir. 1987). But the Supreme Court of the United States has since clarified that the Sixth Amendment guarantees a defendant the right to a speedy *trial*, not a speedy *sentencing*. *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016). "That does not mean, however, that defendants lack any protection against undue delay at [sentencing]." *Id.* at 1617. Federal Rule of Criminal Procedure 32(b)(1) requires courts to "impose sentence without unnecessary delay." *Id.* And, the Supreme Court noted, the convicted defendant maintains his due process rights. *Id.*

Thus, while *Betterman* overruled our speedy sentencing precedent under the Sixth Amendment, our precedent under the Due Process Clause survives. Under that precedent, we apply the same framework adopted by the Supreme Court in *Barker v. Wingo*, considering: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) any prejudice suffered by the defendant. 407 U.S. 514, 530 (1972). Consideration of these factors leads us to the conclusion that Resnick suffered no deprivation of his due process right to a speedy sentencing.

*First*, the length of the delay between conviction and sentencing—more than two-and-a-half years—was substantial. This factor favors Resnick.

But *second*, as the District Court found, three things contributed to the delay in getting to sentencing. (1) This was a very complex fraud scheme involving 18 separate defendants, and the deliberation necessary to address the scheme and its victims required time. (2) Resnick sought several continuances of his sentencing. The government, on the other hand, never requested a continuance. (3) The District Court delayed sentencing to research Resnick's claims that

28

some of the purported victims were not really victims. So any unnecessary delays, if there were unnecessary delays, are mainly attributable to Resnick. None are attributable to the government. This factor weighs heavily against Resnick.

*Third*, Resnick asserted his right to a speedy sentencing in a motion filed on March 3, 2016. Ironically, that motion also sought leave to serve a Rule 17(c) subpoena to obtain additional documents, which would have further delayed sentencing. **(*Id.*)** Resnick's sentencing hearing took place on April 22, 2016, seven weeks after he filed his request. If this factor favors Resnick, it does so with little weight.

*Fourth* and finally, Resnick asserts that the delays to his sentencing prejudiced him because the government was able to identify additional victims and adduce sufficient evidence to prove their losses by a preponderance of the evidence. We do not think this argument is well taken. Allowing the government time to identify additional victims did not affect his Sentencing Guidelines range. Resnick's victim and loss total—whether calculated in 2014 under the initial PSR at 124 victims with $1.2 million in losses, or the government's initial filing of 192 victims with $2.1 million in losses, or in 2015 under the government's revised filing of 253 victims with $2.7 million in losses—always yields a 16-level enhancement. *Compare* U.S.S.G. § 2B1.1(b)(1) (2014)*, with* U.S.S.G. § 2B1.1(b)(1) (2015). Thus, Resnick's Guidelines range was unaffected, and he has failed to show prejudice. This factor also weighs heavily against Resnick.

Taking the four factors together, we conclude that Resnick has failed to show that his due process right to a speedy sentence was violated.

### C. The District Court Correctly Applied the Sentencing Guidelines In Fashioning Resnick's Sentence

Resnick next challenges several of the District Court's findings at sentencing. We "review factual findings relevant to the Guidelines for clear error and … exercise plenary review over a district court's interpretation of the Guidelines." *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007).

*First*, Resnick claims that by adopting the government's proposed timeline for VOG's operations the District Court allowed the government to inflate its victim and loss figures. He argues that, because the government limited the timeframe for its evidence at trial, any victims found outside of that limited timeframe should not count. Of course, because the VOG-conspirators continued operations *during their trial*— through 2014—some victims arose after the government's limited timeframe. It was appropriate for those victims to be included. And we again note that the government's calculation of victims' losses did not affect Resnick's ultimate Guidelines range.

The Sentencing Guideline that applies to Resnick's fraud is § 2B1.1, covering various forms of theft. Following the 2015 amendment, a six-level enhancement should be applied when the crime "resulted in substantial financial hardship to 25 or more victims." U.S.S.G. § 2B1.1(b)(2)(C). That is the highest-level enhancement for number of victims. The definition of "substantial financial hardship" includes "suffering substantial harm to his or her ability to obtain credit." *See* U.S.S.G. application notes § 4(F)(vi). As the credit ratings of all the victims of VOG were severely damaged by VOG's schemes, Resnick began on the wrong side of that threshold. That the government ultimately identified more than 250 victims was immaterial for the Guidelines calculation. And, as discussed in section IV(B), whether using the initial victim and loss estimates in 2014, or the more comprehensive totals following the 2015 amendment, Resnick's victims' loss total yields the same 16-level enhancement.

*Second*, Resnick challenges the District Court's finding that VOG was a fraudulent enterprise from beginning to end. Resnick argues that not all VOG's employees knew that they were part of a fraudulent scheme, so there must have been some non-fraudulent work at VOG. This conclusion does not follow from Resnick's premise because those employees' alleged ignorance is not imputed to Resnick and his co-defendants. A conviction for mail or wire fraud requires both objective misrepresentations and the defendant's subjective knowledge of the misrepresentations. *See* 18 U.S.C. §§ 1341, 1343. The jury found that *Resnick* knowingly participated in VOG's

fraud, so the argument based on others' alleged knowledge does not help him.

Resnick also argues that the finding is inconsistent with the District Court's willingness to consider his argument that not all VOG victims were equally victimized. The District Court noted that VOG had engaged in various types of fraud. That the Court recognized that some instances of VOG's fraud were more flagrant than others does not undermine the District Court's overall finding that VOG was a wholly fraudulent enterprise. Rather, having carefully reviewed this case, we conclude that the Court's finding was supported by substantial evidence and will be affirmed.

*Third*, like Lacerda, Resnick argues that services like debt cancellation and the sale of new timeshares should be credited against the victims' losses. We addressed this argument in section III(D)(1), and our analysis applies equally to Resnick. Cancellation was achieved only because the victims defaulted on their loans, not because of some value-adding intervention from VOG. The defaults impacted the victims' credit ratings in significant and negative ways. The District Court was correct to not credit VOG's alleged "services" against the losses suffered by Resnick's victims. And like Lacerda, Resnick is not entitled to credit against his victim's losses for payments VOG made to perpetuate its fraudulent schemes. *See Hartstein*, 500 F.3d at 800; *Whatley*, 133 F.3d at 606; *Blitz*, 151 F.3d at 1012.

*Fourth* and finally, Resnick argues that, under U.S.S.G. § 2B1.1, refunded monies by third parties should be credited against his victim's losses. The Guidelines provides that the victim's loss "shall be reduced by … [t]he money returned … *by the defendant* or other persons *acting jointly with the defendant*, to the victim *before the offense was detected*." U.S.S.G. § 2B1.1(3)(E)(i) (emphasis added). Resnick argues that he is entitled to credit for refunds to victims made by "escrow compan[ies] utilized to procure third party timeshares" and other "timeshare developers." Appellant Resnick's Br. 71. But there is no evidence that the escrow agents and timeshare developers were "acting jointly" with Resnick, or that the refunds were made "before the offense was

31

detected." The District Court correctly denied any credits against Resnick's victims' losses.

### D. Resnick Forfeited His Objection to the District Court's Restitution Order

Because of the many complexities of this case, restitution was delayed until sometime after sentencing. While Resnick filed a timely notice of appeal from his judgment and sentence, he never appealed from the later-entered order of restitution. Resnick now raises various challenges to the District Court's award of restitution entered against him under 18 U.S.C. § 3663A. But the government contends that we must dismiss Resnick's challenges because of his failure to file a separate notice of appeal from the restitution order. The government is correct.

This issue raises a jurisdictional question, over which we exercise plenary review. *Hamilton v. Bromley*, 862 F.3d 329, 333 (3d Cir. 2017). Resolution of this question is controlled by *Manrique v. United States*, 137 S. Ct. 1266, 1274 (2017), in which the Supreme Court held "that a defendant who wishes to appeal an order imposing restitution in a deferred restitution case must file a notice of appeal from that order." Deferred restitution cases, the Supreme Court explained, involve two appealable judgments, not one. *Id*. at 1273; *see also Dolan v. United States*, 560 U.S. 605, 616–18 (2010). Both the statute and rules governing appeals "contemplate that the defendant will file the notice of appeal *after* the district court has decided the issue sought to be appealed." *Manrique*, 137 S. Ct. at 1271 (emphasis original). So notices of appeal filed before the restitution order cannot be "for review" of the restitution order and are not filed timely from that order. *Id*. The Supreme Court held that filing a timely notice of appeal from an order of restitution was at least a mandatory claim-processing rule, *id*. at 1272 (citing *Greenlaw v. United States*, 554 U.S. 237, 252–53 (2008)), and when the government raises the failure to timely file the notice, our duty to dismiss the appeal is also mandatory, *id*. (citing *Eberhart v. United States*, 546 U.S. 12, 15, 19 (2005)).

Resnick did not file a timely notice of appeal from the order of restitution, and the government has raised this failure

on appeal. Thus, under *Manrique*, Resnick at least violated a mandatory claim-processing rule and we have a mandatory duty to dismiss this issue.

## V.     Objections Raised by Manzoni

In addition to Manzoni's challenge to Special Agent Mesisca's overview testimony, she also argues that (1) the District Court abused its discretion by allowing the prosecution to impeach a codefendant with an audio recording that implicated her; (2) the District Court erred when it joined the charges arising from her participation in the fraudulent activities at VOG and her charge of alleged unemployment fraud; and (3) there was insufficient evidence presented to the jury to sustain her fraud and conspiracy convictions. We will address each of these issues in turn.

### A.     The District Court Did Not Abuse Its Discretion in Admitting Evidence of a Phone Call to a Victim

During trial, it came to light that some defendants had engaged in witness tampering. The government sought to enter the recording of a phone call between one of the defense witnesses, Dennis Nadeau, and a victim, David Jasper, showing an attempt at such tampering. Manzoni objected to admission of the recording on two grounds. At first, she argued that it was unduly prejudicial under Federal Rule of Evidence 403 because, though the evidence of tampering was not being offered against her, she was the subject of the victim's complaint. But this was not apparent from the phone call itself; Manzoni was never actually named by the victim. So she also argued that the phone call should be excluded as hearsay. She presents these same arguments on appeal.

#### 1. *The District Court did not abuse its discretion under Rule 403*

Manzoni asserts that the District Court abused its discretion under Rule 403 by allowing the recording of the phone call into evidence. "We generally review a district court's evidentiary findings for abuse of discretion." *United States v. Bailey*, 840 F.3d 99, 117–18 (3d Cir. 2016). Rule 403 allows relevant evidence to be excluded when its probative

33

value is substantially outweighed by the potential for unfair prejudice. *Id.* at 117. When a district court conducts an on-the-record weighing of probative value against unfair prejudice, its evidentiary decision is entitled to great deference. *Id.* "In order to justify reversal, a district court's analysis and resulting conclusion must be arbitrary or irrational." *Id.*

In this case, the District Court conducted an on-the-record Rule 403 analysis—both orally and in a later written order. The District Court found that the phone call's "probative value as to the consciousness of guilt" outweighed any prejudice. App. 5015:3–5. But it also recognized that there could be some spillover effect for Manzoni, so it acted to mitigate that unfair prejudice by offering multiple curative instructions—including one drafted by Manzoni. The District Court's analysis and its conclusion were neither arbitrary nor irrational. We therefore find no abuse of the District Court's discretion under Rule 403, and we will uphold the District Court's decision to allow the recording into evidence.

### 2. Because the phone call was offered for a non-hearsay purpose, it was not hearsay

Manzoni next argues that the phone call was hearsay. "Whether a statement is hearsay is a legal question subject to plenary review." *United States v. Price*, 458 F.3d 202, 205 (3d Cir. 2006). Under Federal Rule of Evidence 801(c), "hearsay" is any statement that a declarant makes outside of court and that is offered to prove the truth of the matter asserted in the statement. Statements offered for non-hearsay purposes are not hearsay. *See Price*, 458 F.3d at 211. As the advisory committee's notes to the rule make clear, statements that are offered merely to show that they happened are not offered for a hearsay purpose. *See* Fed. R. Evid. 801 note (subdiv. (c)) (citing *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70 (7th Cir. 1950), *rev'd on other grounds* 340 U.S. 558 (1951)). The recording of the phone call between Nadeau and Jasper was not offered to prove the truth of any of Jasper's assertions, but to show that Nadeau had in fact contacted some of the victims. So the phone call was not hearsay, and Manzoni has failed to show that the District Court abused its discretion by allowing it into evidence.

34

### B. Manzoni Was Not Prejudiced by the Joinder of Her VOG-Fraud and Employment-Fraud Charges

In separate counts, Manzoni was charged with fraud and conspiracy for her participation in the VOG scheme, and with fraud for allegedly collecting unemployment benefits from the State of New Jersey while she was employed at VOG. Manzoni moved to sever the charges under Federal Rule of Criminal Procedure 8. Although the District Court recognized that the propriety of joinder here was a close question, it denied her motion. Manzoni argues that it was error to join her VOG-fraud and unemployment-fraud charges because they lacked a sufficient nexus and were not part of the same transaction. The appeal of a denial of a motion under Rule 8 is a claim of legal error, which we review *de novo*. *United States v. Jimenez*, 513 F.3d 62, 82 (3d Cir. 2008).

Joinder is controlled by Rule 8. Generally, Rule 8(a) addresses joinder of offenses and Rule 8(b) joinder of defendants. But Rule 8(a) only applies to prosecutions involving a single defendant; "in a multi-defendant case such as this, the tests for joinder of counts and defendants is merged in Rule 8(b)." *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003) (internal quotations omitted). "Although the standards of Rule 8(a) and Rule 8(b) are similar, in that they both require a transactional nexus between the offenses or defendants to be joined, Rule 8(a) is more permissive than Rule 8(b) because Rule 8(a) allows joinder on an additional ground, i.e., when the offenses are of the same or similar character." *Id.* at 287 n.4 (citations and internal quotations omitted); *see also Jimenez*, 513 F.3d at 82 ("[J]oinder of defendants under Rule 8(b) is a stricter standard than joinder of counts against a single defendant under Rule 8(a)."). For joinder of Manzoni's cases to have been proper under Rule 8(b), they either would have had to originate "in the same act or transaction," or have otherwise been integral to one another. *See United States v. Riley*, 621 F.3d 312, 334 (3d Cir. 2010).

The District Court determined that joinder was proper because Manzoni's employment in the VOG scheme was integral to the unemployment-fraud charge: she was charged with fraudulently collecting unemployment benefits while she

was employed by, and receiving compensation from, VOG. But the opposite is not necessarily true. Rather, Manzoni suggests, allegations that she illicitly collected unemployment benefits would not have been integral to her participation in the VOG scheme, so joinder was improper. But even assuming, *arguendo*, that Manzoni is correct, the District Court still did not commit reversible error.

Under Federal Rule of Criminal Procedure 52(a), we must disregard "[a]ny error, defect, irregularity, or variance that does not affect substantial rights …." We have explained that "an error involving misjoinder affects substantial rights and requires reversal only if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Jimenez*, 513 F.3d at 83 (brackets and internal citations omitted). Here, any potential misjoinder would have been harmless because the record shows that the joinder did not influence the jury's verdict against Manzoni; after all, she was acquitted of the allegedly misjoined charge.

Because Manzoni's employment at VOG was integral to the unemployment-fraud charges, unfair prejudice in this case can only flow in one direction. That is, it would have been *proper* for the jury to conclude that, because Manzoni was employed and receiving compensation with the VOG scheme, she was committing fraud by receiving unemployment benefits from the State of New Jersey. It would have been *improper*, however, for the jury to conclude that, because Manzoni committed unemployment fraud, she must also have participated in the VOG fraud. But the jury did not reach that conclusion; rather, it convicted Manzoni of her role in the VOG scheme despite acquitting her of unemployment fraud. So joinder of the fraud counts did not affect the jury's verdict and any error in joining the charges was harmless.

### C. Manzoni's Conviction Was Supported by Sufficient Evidence

Finally, Manzoni challenges the sufficiency of the evidence to support her fraud and conspiracy convictions. Our standard of review on a challenge to the sufficiency of the evidence is plenary. *United States v. Boria*, 592 F.3d 476, 480

(3d Cir. 2010). But that plenary review is greatly tempered by giving substantial deference to the jury's finding of guilt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). Employing that deference, and applying the applicable legal standards, we find the evidence was sufficient to support the jury's guilty verdict.

The Supreme Court of the United States has explained:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be … to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson*, 443 U.S. at 318–19 (internal quotations and citations omitted). In conducting this review, all reasonable inferences must be drawn in favor of sustaining the verdict. *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996). Reversal of a conviction is only appropriate where there is "no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." *United States v. Mussare*, 405 F.3d 161, 166 (3d Cir. 2005).

Manzoni was charged with conspiracy to commit wire fraud under 18 U.S.C. § 1349 and wire fraud under 18 U.S.C. § 1343. To prove wire fraud, the government had to show that Manzoni had the intent to commit fraud. *See* 18 U.S.C. § 1343. So the question here is whether Manzoni's participation in the VOG scheme was knowing or intentional.

Manzoni argues that the evidence presented at trial at most showed that she said things as a VOG representative that were not true, not that she was a knowing participant in the fraud. She claims that this case should be controlled by *United*

*States v. Pearlstein*, 576 F.2d 531, 542–43 (3d Cir. 1978), in which we reversed the fraud convictions of lowly sales representatives who only read from a sales script, without knowing that the script contained false statements. In light of the evidence admitted at trial, we find that *Pearlstein* does not apply.

First, Manzoni was no lowly sales representative—she was one of the managers at VOG. From her position as a manager, and her long experience in the timeshare industry, a jury could reasonably infer that she knew that statements in VOG's phone scripts were false. Second, even before she was a manager, while working as one of VOG's closers, Manzoni did more than just mechanically read false statements from a controlled sales script. She showed initiative by inventing fake payoff amounts for the customers, without approval—much less direction—from her supervisors, and then creating urgency by imposing arbitrary deadlines by which these (fake) offers had to be accepted before they expired. Based on this evidence, as the District Court correctly found, a reasonable jury could conclude beyond a reasonable doubt that Manzoni was "a knowing, even integral part, of [the] fraud scheme." SA 1151.

## VI. Conclusion

For all of the reasons discussed above, we will affirm the judgments of conviction and sentences entered against Lacerda, Resnick, and Manzoni.