**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1621
_____

UNITED STATES OF AMERICA

v.

DORY L. SATER,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 3-19-cr-113)
District Judge:  Honorable Robert D. Mariani
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 16, 2023
_____

Before:  CHAGARES, Chief Judge, GREENAWAY, JR., and PHIPPS, Circuit Judges

(Opinion filed: May 31, 2023)
_____

OPINION[*]
_____

_____

[*]This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

CHAGARES, Chief Judge.

Dory Sater was convicted of bank fraud and aggravated identity theft after he forged and filed a mortgage satisfaction document. Sater appeals his convictions for lack of sufficient evidence, and he alleges that the District Court improperly applied an enhancement at sentencing. He also appeals the District Court's order rejecting his claim that his due process rights were violated by the delay between the convictions and his sentencing. For the reasons explained below, we will affirm the judgment of the District Court.

I.

We write solely for the parties and so recite only the facts necessary to our disposition. Sater, a lawyer, opened his own law firm. To finance the endeavor, he obtained a $50,000 line of credit from Fidelity Bank using his parents' home as collateral. Sater soon fell behind on payments, and the bank notified his parents of the possibility of foreclosure of their home. Sater then resumed making regular payments, only to fall behind again. After pressure from his father to remove the home from the loan, Sater forged a mortgage satisfaction document and filed it at the Luzerne County Courthouse.

Sater's father — under the mistaken belief that Fidelity no longer had a mortgage on his home — became confused when he continued to receive inquiries about the mortgage. He then obtained a copy of the satisfaction document from the courthouse and provided it to Fidelity. Heather Kazinetz, a bank representative, ordered a title search on the property and found that the bank's mortgage was not listed. She soon realized that the mortgage satisfaction document was fake because her signature on the document was

2

forged. The bank then reported the incident to law enforcement.

Sater was interviewed by the FBI. During the interview, Sater admitted that he prepared and filed the false document because his parents were considering moving, and he wanted to give them peace of mind.[1] Sater was later indicted on charges of attempted bank fraud and aggravated identity theft. After a six-day trial, the jury returned guilty verdicts on both counts. Sater moved for a judgment of acquittal, contending that there was insufficient evidence to support the jury's verdict. The District Court denied the motion.

After his conviction, but before sentencing, Sater was arrested and detained on unrelated Pennsylvania state criminal charges. He eventually pled guilty to some of the state charges. The District Court scheduled Sater's sentencing 16 months after he was convicted at trial. A few weeks before the scheduled sentencing, Sater moved for relief related to the delay in sentencing. He contended that the delay constituted a violation of his due process rights. The District Court denied that motion and proceeded with sentencing the next day.

At sentencing, Sater objected to the application of a two-level sentencing enhancement pursuant to section 3B1.3 of the U.S. Sentencing Guidelines, which pertains to the use of a special skill to facilitate the commission of the offense. The District Court denied the objection and applied the enhancement. Sater was sentenced to 36 months of imprisonment.

---

[1] Sater, with the help of his sister, eventually paid off the loan.

Sater timely appealed his convictions, the District Court's order denying his due process challenge, and the application of the sentencing enhancement.

## II.[2]

## A.

Sater first argues that the evidence was insufficient to support his convictions. We exercise plenary review over such determinations. See United States v. Lacerda, 958 F.3d 196, 225 (3d Cir. 2020). We review the sufficiency of the evidence in the light most favorable to the prosecution; if a rational juror could find the elements of the crimes beyond a reasonable doubt, we must sustain the verdict. United States v. Fattah, 914 F.3d 112, 162 (3d Cir. 2019).

Sater was convicted of attempted bank fraud or bank fraud in violation of 18 U.S.C. § 1344. The jury clarified that it found him guilty under both 18 U.S.C. § 1344(1) and (2). On appeal, Sater argues that there was insufficient evidence to support a guilty verdict under either provision.[3] We disagree.

Section 1344(1) prohibits a defendant from "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice . . . to defraud a financial institution." 18 U.S.C. § 1344(1). Under that provision, "the scheme must be one to . . . deprive [the

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[3] Sater was also convicted of aggravated identity theft. That offense requires an underlying felony, see 18 U.S.C. § 1028A(a)(1), which the Government alleges is the bank fraud. Sater accordingly argues that because the aggravated identity theft count hinges on proof of bank fraud, his sufficiency arguments implicate all counts. He does not make any other challenges to the aggravated identity theft conviction.

bank] of something of value," but it does not require "ultimate financial loss" or "intent to cause financial loss." Shaw v. United States, 580 U.S. 63, 67, 72 (2016). In a decision preceding Shaw, we held that under 18 U.S.C. § 1344(1), the defendant must put the bank at a "risk of loss." United States v. Jimenez, 513 F.3d 62, 75 (3d Cir. 2008).[4]

Sater argues that he did not put Fidelity at a risk of loss because under Pennsylvania state law, "the bank's lien would have retained priority even if a buyer bought the Saters' home with the false mortgage satisfaction piece in place." Sater Br. 20–21 (citing Leedom v. Spano, 647 A.2d 221, 228–29 (Pa. Super. 1994)). But that facet of state law does not obviate all risks of loss faced by Fidelity. As an initial matter — assuming Sater's recitation of Pennsylvania state law is correct, an issue we decline to decide — Fidelity still would have had to act on its rights and reinstate the mortgage. And that is exactly what happened here. Fidelity hired a lawyer who petitioned the Luzerne County Court of Common Pleas, caused that court to strike the fraudulent document, and got the mortgage reinstated. Fidelity faced both the loss associated with reinstating its mortgage and the loss of the collateral until the reinstatement process was complete.[5] In addition to the losses actually incurred, at the time the fraud was committed, Fidelity faced further risks of loss. Sater's parents could have moved before Fidelity became aware of the fraud, which would have meant that the bank lost its right to

---

[4] We need not decide whether "risk of loss" remains an independent element of bank fraud after Shaw because — for the reasons discussed above — Sater clearly put Fidelity at a risk of loss.

[5] Sater argues that the statute does not "contemplate" the "temporary risk of loss during successful litigation." Sater Br. 21. But without any authority to support that assertion, we reject it out of hand.

5

object to the sale. Moreover, were Sater to have again defaulted, perhaps years down the road, it is not a guarantee that Fidelity could have proven the fraud and collected the collateral. That chance put Fidelity at risk of losing any remaining loan principal and interest. Put another way, when the evidence is viewed in the light most favorable to the prosecution, there is no doubt that the bank was put at a risk of loss.

Sater also argues that he did not have the required intent to defraud Fidelity because "any deception . . . would have been directed at potential home buyers." Sater Br. 20. But the requisite mens rea is knowledge, not purpose. 18 U.S.C. § 1344. Even if the purpose of the scheme was to deceive potential home buyers (or his parents), that says nothing about whether Sater knowingly sought to deceive Fidelity. See Shaw, 580 U.S. at 69 (rejecting the defendant's argument that the statute requires the Government to prove more than the defendant's "simple knowledge"). For the reasons described supra, Sater's fraud clearly implicated the bank. A rational juror easily could have concluded that Sater knowingly sought to deceive the bank, even if that was not his purpose.

Sater's contention that the Government did not present sufficient evidence to convict him under 18 U.S.C. § 1344(2) is similarly unpersuasive. Under that provision, a defendant is prohibited from "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice . . . to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C.§ 1344(2). The Supreme Court has clarified that § 1344(2) does not require "the Government to prove that the defendant's scheme created a risk of financial loss to the bank." Loughrin v. United States, 573 U.S.

6

351, 366 n.9 (2014).

Sater argues that the evidence is insufficient to show that he acquired or attempted to acquire bank property "by means of" misrepresentation. Sater Br. 21 (quoting 18 U.S.C. § 1344(2)). But in making that claim, Sater simply rehashes his prior arguments. Sater first contends that his filing of the false mortgage satisfaction document could not have caused Fidelity to part with its money because of the Pennsylvania state law providing that the bank's lien would have retained priority. But for the same reasons discussed supra, Sater's misrepresentation — in the form of the fraudulent mortgage satisfaction document — caused the bank to part with its money when it had to hire a lawyer to reinstate the mortgage and it placed the bank at risk of losing its ability to recover the loan in the event of additional defaults.

Sater also contends that the "by means of" requirement was not satisfied because the false mortgage satisfaction document was not directed at Fidelity or designed to reach it. Even if Sater filed the false document to placate his father, that says nothing about whether the document would reach the bank. Here, it is undisputed that the document did in fact reach the bank. And were Sater to default yet again and the bank were to move for foreclosure, it likely would have come across the false mortgage satisfaction document in trying to collect the debt. In short, Sater's arguments fare no better in the context of 18 U.S.C. § 1344(2) than they did in the context of 18 U.S.C. § 1344(1).

In sum, a rational juror could have easily concluded that the Government proved the elements of the crimes beyond a reasonable doubt, and so we will affirm the

convictions.

B.

Sater also argues that the District Court erred when it denied his motion alleging that the 16-month delay in sentencing violated his constitutional due process rights. We review the District Court's legal conclusions de novo and its findings of fact for clear error. Burkett v. Fulcomer, 951 F.2d 1431, 1437–38 (3d Cir. 1991). In assessing such due process claims, we consider: "(1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) any prejudice suffered by the defendant." Lacerda, 958 F.3d at 219–20.

Sater contends that the District Court "placed undue reliance" on Sater's failure to demand an earlier sentencing, the third factor in the legal test.[6] Sater Br. 24. We disagree. Sater relies on United States v. Ray, an out-of-circuit decision holding that when a defendant seeks a modified sentence because of the prejudice resulting from the delay (as is alleged here), it is improper to consider whether the defendant took steps to be sentenced more quickly. 578 F.3d 184, 200 (2d Cir. 2009). But our own precedent and that of the Supreme Court suggests otherwise. In Barker v. Wingo, the Supreme Court explained that a defendant's assertion of the right sheds light on the other factors and is thereby "entitled to strong evidentiary weight." 407 U.S. 514, 531 (1972) ("The more serious the deprivation, the more likely a defendant is to complain."); see also Burkett, 951 F.2d at 1441 (holding that the defendant's continuous assertion of his right

_____

[6] Sater does not contest the District Court's conclusions with respect to the first and second factors.

counseled in his favor); Gov't of the Virgin Islands v. Pemberton, 813 F.2d 626, 628 (3d Cir. 1987) (holding that the factor weighs against the defendant because he did not make a reasonable assertion of his right).[7]  Because we are bound by such decisions, we hold that the District Court did not err in assigning heavy weight to Sater's failure to assert his right to a speedy sentencing prior to the motion at issue.[8]

Sater also argues that he suffered prejudice as a result of the delay in sentencing. But Sater simply repeats the arguments about prejudice that he made to the District Court, without contending with any of its detailed findings that he did not suffer prejudice.  See App. 357–64 (discussing at length how Sater's indictment and detention on unrelated state charges have nothing to do with the federal convictions and did not bring about prejudice).  For much of the same reasons as the District Court, we hold that Sater has not shown that he has suffered prejudice as a result of the delay in sentencing.

In short, the District Court did not err when it denied Sater's motion for relief based on the delay in his sentencing.

## C.

Sater lastly argues that the District Court erred in applying a two-level sentencing enhancement.  We review legal issues regarding the Sentencing Guidelines de novo and

---

[7] The decisions cited above considered the defendant's right to a speedy trial and not the right to a speedy sentence.  But because we apply the same factors to speedy trial claims as we do to speedy sentencing claims, see Lacerda, 958 F.3d at 219–20, those decisions are instructive here.

[8] Sater's failure to assert his right to a speedy sentencing is all the more glaring given that the state court judge in the Pennsylvania criminal proceedings encouraged Sater to reach out to the District Court about his sentencing in this case.  Sater failed to do so until he filed the motion at issue on the eve of sentencing.

its findings of fact for clear error. United States v. Bell, 947 F.3d 49, 54 (3d Cir. 2020). The pertinent Sentencing Guideline provides that "[i]f the defendant . . . used a special skill, in a manner that significantly facilitated the commission or concealment of the offense" a two-level enhancement applies. U.S.S.G. § 3B1.3. Comment 4 defines "special skill" as those skills "not possessed by members of the general public and usually requiring substantial education, training or licensing" and lists examples of those possessing special skills, including lawyers. U.S.S.G. § 3B1.3 cmt. 4.

Sater first contends that in applying the enhancement, the District Court improperly relied on the commentary to the Guidelines. Under our precedent, Sater explains, the commentary may only be consulted after a district court determines that the guideline itself is genuinely ambiguous. Sater Br. 28 (discussing United States v. Adair, 38 F.4th 341, 347–49 (3d Cir. 2022)). Sater argues that the District Court, in reciting the commentary verbatim, erred because the guideline itself is not genuinely ambiguous. Consulting dictionaries, Sater concludes that a special skill "is unusual or extraordinary and acquired through special training." Sater Br. 31. But even using that definition of "special skill," the work of a lawyer easily falls into that category. The legal profession is indeed "unusual or extraordinary" and attorneys have acquired their skills through "special training" in the form of law school, continuing legal education, practice, and the like. So even if the District Court erred in consulting the commentary — an issue we decline to decide — under Sater's interpretation of the guideline, he possessed a special skill.

Sater next contends that even if he had a special skill, he did not use that skill to

10

facilitate the offense because anyone could search the internet and create and file a mortgage lien release.  We reject that argument for the same reasons as the District Court.  Even if template mortgage satisfaction documents are available online, Sater undoubtedly knew that such a document had to be filed in the first instance, and he knew how and where to file it.  He also created a document that looked similar to what Fidelity uses, complete with a forged notary certification and the forged signature of the relevant bank employee.  In other words, the District Court did not err — clearly or otherwise — when it found that Sater used a special skill in facilitating the offense.

Because the District Court correctly applied the two-level sentencing enhancement, we will affirm Sater's sentence.

III.

For the foregoing reasons, we will affirm the District Court's judgment.